# EXHIBIT E

OFFICER JOSEPH OOMENS                                    October 30, 2019

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   DIONTE YOUNG,                    )
                                      )
 4              Plaintiff,            )
                                      )
 5        vs.                         ) No. 17 CV 1914
                                      )
 6   THOMAS DART, COOK COUNTY         )
     SHERIFF, et al.,                 )
 7                                    )
                Defendant.            )
 8

 9            The deposition of OFFICER JOSEPH OOMENS,

10   called by the Plaintiff for examination pursuant to

11   notice and pursuant to the Rules of Civil Procedure

12   for the United States District Courts pertaining to

13   the taking of depositions, taken before Barbara

14   Perkovich, a notary public within and for the County

15   of Cook and State of Illinois, at 45th Floor, 353

16   North Clark, Chicago, Illinois on the 30th day of

17   October 2019.

18

19

20

21

22

23

24
```

```
                                                           Page 2
 1   APPEARANCES:
 2   JENNER & BLOCK
     BY:  MR. AMIT PATEL
 3   353 North Clark Street
     45th Floor
 4   Chicago, Illinois 60654
     (312) 222-9350
 5   apatel@jenner.com
             Appearing on behalf of the Plaintiff;
 6
 7   STATE'S ATTORNEY OF COOK COUNTY ILLINOIS
     BY:  MS. BIANCA BROWN
 8   Assistant State's Attorney
     500 Richard J. Daley Center
 9   Chicago, Illinois 60602
     (312) 603-6638
10   bianca.brown@cookcountyil.gov
             Appearing on behalf of the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                           Page 3
 1              I N D E X
     WITNESS:                                         PAGE
 2
     JOSEPH OOMENS
 3
         Examination by:
 4
             Mr. Patel                               5, 41
 5
             Ms. Brown                                  38
 6
 7
 8
 9
10          E X H I B I T S
     NUMBER                              FOR IDENTIFICATION
11
             (None so marked.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                           Page 4
 1          THE VIDEOGRAPHER:  Good morning, we are
 2   on the record.  This is the videotaped
 3   deposition of Joseph Oomens in the matter of
 4   Dionte Young versus Cook County Sheriff's
 5   Office, et al., Cause No. 17 CV 01914.
 6          This deposition is taking place
 7   at 353 North Clark Street on the 45th Floor
 8   in Chicago, Illinois, on October 30th, 2019
 9   at 11:24 a.m.
10          My name is Tim Kelly, I'm the
11   videographer with U.S. Legal Support located
12   at 200 West Jackson Boulevard in Chicago,
13   Illinois.  Video and audio recording will be
14   taking place unless all counsel agree to go
15   off the record.  Will counsel please state
16   their appearances for the record.
17          MR. PATEL:  Amit Patel for Plaintiff.
18          MS. BROWN:  Bianca Brown for Defendant.
19          THE VIDEOGRAPHER:  The certified court
20   reporter is Barb Perkovich.  Please swear in
21   the witness.
22          (Witness sworn.)
23
24
```

```
                                                           Page 5
 1          OFFICER JOSEPH OOMENS,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4              EXAMINATION
 5   BY MR. PATEL:
 6     Q.   Good morning, Officer, can you state
 7   your full name FOR THE record?
 8     A.   Joseph Oomens.
 9     Q.   Officer Oomens, have you been deposed
10   before, sat for a deposition before?
11     A.   Yes.
12     Q.   When was that?
13     A.   Close to ten years ago.
14     Q.   Ten years ago.  And what was it
15   regarding, if you remember?
16     A.   I don't remember exactly what it was.
17     Q.   Okay.  So since it's been a little
18   while, I'll give you a refresher on sort of the
19   ground rules for depositions.  So you've been
20   sworn in, you're testifying here under oath, just
21   like you would be if you were in court in front of
22   a judge.
23          So I'm going to ask you some questions,
24   and you're expected to answer truthfully and
```

Page 6

1  completely, to the best of your knowledge.  Just
2  as if you were in court.  Does that make sense?
3      A.   Yes.
4      Q.   So we have a court reporter here and a
5  videographer here taking down, recording
6  everything we say.  So we'll want to make sure
7  to -- when I ask you a question, give a verbal
8  response, no nods, uh-huhs, et cetera.
9      A.   Yes.
10     Q.   Just because those are harder to take
11 down in writing.  And also, when I ask you a
12 question, make sure to let me finish the question
13 before you respond and I'll make sure to let you
14 finish your response before you ask me -- or
15 before I ask you my next question, just so we're
16 not talking over each other.  Does that make
17 sense?
18     A.   Yes, it does.
19     Q.   So if you answer a question I asked,
20 I'm going to assume you understood it.  If you
21 don't, we can have the court reporter read back
22 the question, if you didn't hear me.  Or if you
23 didn't understand it, you can ask me to clarify
24 and I can try to ask it differently.  Does that

Page 7

1  make sense?
2      A.   Yes, it does.
3      Q.   Okay, great.  And lastly, you are
4  welcome to ask for a break if you need, just make
5  sure to answer whatever pending question there is,
6  before we go off the record.  Does that make
7  sense?
8      A.   Yes, that makes sense.
9      Q.   Is there any reason why you don't think
10 you would be able to respond truthfully and
11 completely today?
12     A.   No, I do not.
13     Q.   Great, thank you.  So your title is
14 officer; is that correct?
15     A.   Correct.
16     Q.   And how long have you held that title
17 with the Cook County Sheriff?
18     A.   28 years.
19     Q.   28 years, okay.  And what were you
20 doing before then?
21     A.   Before that I was in the military.
22     Q.   Okay.  And how long were you in the
23 military?
24     A.   Four years.

Page 8

1      Q.   Four years you said?
2      A.   Yes.
3      Q.   You have been working at Cook County
4  jail the entire time?
5      A.   Yes.
6      Q.   And where do you currently work within
7  the Cook County jail?
8      A.   Currently I'm in Division 9.
9      Q.   Division 9.  And how long have you been
10 there?
11     A.   Six months.
12     Q.   Before Division 9, where were you?
13     A.   Receiving.
14     Q.   Receiving.  And how long were you in
15 receiving?
16     A.   Approximately six years.
17     Q.   Six years, okay.  And before that, if
18 you remember?
19     A.   Division 6.
20     Q.   Division 6?
21     A.   Approximately 12 years.
22     Q.   12 years, okay.  We won't make you go
23 through the entire 28 years, unless we need to.
24 So that should be okay for now.

Page 9

1           So have you done anything to prepare
2  for this deposition so far?  And I don't want you
3  to get into any discussions you've had with your
4  counsel here.
5      A.   No.
6      Q.   Have you spoken to Officer Brewer about
7  this deposition or this case?
8      A.   No, I have not.
9      Q.   You have not.  Have you spoken to
10 Sergeant Plant about this deposition or this case?
11     A.   No, I have not.
12     Q.   This case is about an incident that
13 took place in 2016, in November, so almost exactly
14 three years ago.  So most of the questions I'm
15 going to be asking you will be about your time in
16 receiving.  So can you describe to me what your
17 role was in receiving?
18     A.   My role in receiving has been working
19 on the midnight shift, taking care of what was
20 left over from the afternoon shift on getting the
21 inmates to their housing assignments.  Or if my
22 job entitled that day, it would be doing
23 sanitation on the midnight shift.
24     Q.   When you say getting inmates to their

Page 10

1  housing, where are you getting the inmates to
2  their housing from, I guess?
3      A.    The inmates on the new, have to go
4  through a process. The processing is not always
5  done by the time I would start work at 10:00
6  o'clock at night. So we would go and finish up
7  what needed to be done, put them in the bullpens,
8  get them classified and get them to their housing
9  assignments.
10     Q.    So you are talking about new people who
11 are arrested?
12     A.    Yes.
13     Q.    And just haven't been finished
14 processing?
15     A.    Correct.
16     Q.    During the shift prior to yours, okay.
17 Would there be times when you would work shifts
18 other than the midnight shift?
19     A.    Yes.
20     Q.    How often would you say that would be?
21     A.    Two to five days a week, I would do
22 overtime on the day shift.
23     Q.    On the day shift, would your duties or
24 responsibilities be different than the midnight

Page 11

1  shift?
2      A.    Yes.
3      Q.    How would they be different?
4      A.    On the day shift, typically, I would be
5  either in male holding or on the bridge taking
6  care of the inmates going to court.
7      Q.    Can you describe what you would be
8  doing with the inmates that would be going to
9  court?
10     A.    The divisions would bring them to
11 either location, the court pass would be checked,
12 they would be put into the proper bullpen. The
13 ID's would be scanned that they were in whichever
14 location and then they would stay in the bullpens
15 until they're ready to go up to the courtrooms, or
16 be picked up by the buses to go out to the
17 outlying courts.
18     Q.    When you say when they're coming in and
19 you're checking make sure that they're going to
20 the proper location, are you referring to making
21 sure that they're -- when they come from their
22 division, they are going to the proper bullpen?
23     A.    Yes.
24     Q.    And you would check their ID's to

Page 12

1  determine which bullpen they should go to?
2      A.    No, we would check the court pass to
3  see what courtroom they were going to.
4      Q.    Would the court pass have -- let me
5  strike that.
6            Would that process be different
7  depending on which division they came from?
8      A.    No.
9      Q.    And so certain divisions have detainees
10 that are different security classifications, would
11 you agree with that?
12     A.    Yes.
13     Q.    And so you work in Division 9 right
14 now?
15     A.    Correct.
16     Q.    And is it correct that Division 9 is
17 solely maximum security detainees?
18     A.    No, it is not.
19     Q.    What security classification?
20     A.    Medium max.
21     Q.    Medium and max?
22     A.    Medium and max, yes.
23     Q.    So when you're -- strike that.
24           When detainees come in from their

Page 13

1  divisions and you are directing them to the
2  bullpens based on their courtroom assignment,
3  listed on their court pass, you do not take into
4  consideration or look at their security
5  classification; is that right?
6      A.    No, it is not done.
7      Q.    In your 28 years working at the jail,
8  was that ever done?
9      A.    No.
10     Q.    When you started working in receiving,
11 and were responsible for, forgive me if I'm not
12 using the right term, processing detainees as
13 they're going from their housing to court, how did
14 you learn about what the process you had to follow
15 was?
16     A.    Which process?
17     Q.    Just what you have to do when a
18 detainee shows up from their division.
19     A.    Okay, so the going to court process is
20 what you're talking about?
21     Q.    Yes.
22     A.    That would be, as you're doing it, you
23 would be working with somebody else and after
24 doing it and paying attention to what they're

Page 14

1  doing, then you would be able to do it yourself.
2      Q.    Are there documents that you would
3  refer to to know what you're supposed to do?
4      A.    There is a list on which courtrooms go
5  into which bullpens.
6      Q.    Let me ask it a different way.  For
7  example, you mentioned that as detainees come in
8  from their divisions --
9      A.    Yes.
10     Q.    -- you look at their court pass.  Is
11 there a document that says officers working in
12 receiving must check detainee's court passes when
13 they arrive from their divisions?
14     A.    No, there isn't.
15     Q.    And so you just learned that, like you
16 said, from working with somebody who knows the
17 process?
18     A.    Yes.
19     Q.    What about -- so you were in receiving
20 for six years?
21     A.    Yes.
22     Q.    Did you work in receiving at any point
23 in your 28 years before that most recent six-year
24 period?

Page 15

1      A.    No.
2      Q.    When the procedures that you're
3  supposed to follow change or updated in some way,
4  how do you learn about that?
5      A.    Can you rephrase that question?
6      Q.    Sure.  I'll give you an example.  I
7  don't know if this has happened or not, but
8  hopefully it will help you understand it a little
9  better.  So one of the things you do, you said, is
10 checking court asses, when detainees arrive,
11 right?
12     A.    Yes.
13     Q.    Let's say, just as a hypothetical,
14 you're supposed to check court pass and some other
15 piece of information that the detainee may be
16 carrying, if that new step was -- if you were
17 responsible for following that additional step,
18 how would you learn about that?
19     A.    It would be passed on through the
20 supervisors.
21     Q.    Supervisors.  And what are the
22 supervisors' title?  Is it supervisor or is it
23 something else?
24     A.    Sergeant, lieutenant, superintendent

Page 16

1  director, depending on who it came down from, it
2  would go from that person down to -- down through
3  the supervisory staff until the sergeants told the
4  officers.
5      Q.    And so the sergeants would communicate
6  that verbally, generally?
7      A.    Yes.
8      Q.    Would there ever be communications in
9  writing, whether e-mail?
10     A.    There might be e-mails between whoever
11 decided to do a change and to the lieutenant, but
12 as far as lieutenant and sergeant and down, I do
13 not believe there would be.
14     Q.    Do you remember any changes of any kind
15 recently, in receiving?
16     A.    No.
17     Q.    Or in Division 9?
18     A.    No.
19     Q.    So we talked about the process you
20 follow when detainees arrive from their division,
21 and you direct them to the various bullpens,
22 depending on their court assignment.  Once
23 they're -- the detainees are in the bullpens, what
24 do you do next?

Page 17

1      A.    When court services are ready for the
2  inmates, we take their minimis paperwork and start
3  calling them out by courtroom.
4      Q.    And court services informs you that
5  they're ready how?
6      A.    The officer comes down and says, let's
7  get this rolling.
8      Q.    And that's a courtroom deputy?
9      A.    Yes.
10     Q.    So you have their, you said, minimis
11 papers --
12     A.    Yes.
13     Q.    In receiving already?
14     A.    Yes.
15     Q.    And so you look at the stack for
16 Courtroom 200 and you go through it; is that
17 accurate?
18     A.    Correct.
19     Q.    And can you describe, in a little more
20 detail, as you're going through the papers.  What
21 you're doing as you call out the names?
22     A.    As I call out the names, I ask the
23 inmates to show me their ID, so I can verify them.
24 Division 10, their ID's are taken from them, so I

Page 18
1  have to ask them for their inmate number, which is
2  written on the minimis paperwork.
3       Q.   Do you know why Division 10 detainees
4  have their ID's taken away from them?
5       A.   Because a lot of the inmates there have
6  flushed ID's down the toilet or lost their ID's,
7  so we don't have to keep making new ID's, they are
8  taken from them.
9       Q.   Why is that something unique to
10 Division 10?  Or let me ask it -- strike that.
11           What is -- strike that.
12           Does Division 10 hold a specific
13 category of detainee?
14      A.   No, Division 10 has a lot of medical
15 wings on it, so they have a lot of -- they have a
16 lot of variety of inmates in there, detainees in
17 there.
18      Q.   Division 10 detainees have medical
19 issues?
20      A.   Yes.
21      Q.   Generally.
22      A.   Medical and/or psych.
23      Q.   And so you're saying because of the
24 medical or psychological issues, often the

Page 19
1  detainees in Division 10 get rid of their, lose
2  their or flush their ID's down the toilet as an
3  example you used?
4       A.   Yes.
5       Q.   Going back to the process, when
6  detainees arrive from their division, is there any
7  reason why you would keep a detainee out of the
8  bullpens that you would normally direct detainees
9  to?  For example, is there any reason why you
10 would separate a detainee from the rest of the
11 detainees that are in the bullpen?
12      A.   The detainees on canes and crutches
13 would be set on a bench to the side to minimize
14 their need to walk.
15      Q.   Any other reason besides people using
16 canes or crutches?
17      A.   No, there shouldn't be.
18      Q.   Are you familiar with the term
19 protective custody?
20      A.   Yes.
21      Q.   Can you describe what that is?
22      A.   Protective custody inmates are kept by
23 themselves and they have a separate bullpen in
24 receiving and on the bridge.

Page 20
1       Q.   So if a protective custody detainee
2  comes in, you would keep them in a bullpen that
3  only has protective custody detainees?
4       A.   Yes.
5       Q.   But they would -- there would be
6  multiple protective custody detainees in that
7  bullpen?
8       A.   Correct.
9       Q.   What are the reasons, that you're aware
10 of, that somebody would be in protective custody?
11      A.   The biggest reason would be that the
12 detainee requested protective custody.
13 Occasionally there is a court order for the
14 detainee to be put into protective custody.
15      Q.   And are you aware of the reasons why a
16 court order would require protective custody?
17           MS. BROWN:  Objection, speculation.
18 BY MR. PATEL:
19      Q.   You can answer the question, if you're
20 aware.
21      A.   No, I do not know why the judge would
22 order a detainee to be put into protective
23 custody.
24      Q.   And how do you know that an inmate is

Page 21
1  supposed to be in protective custody?
2       A.   An inmate in protective custody will
3  have an orange or yellow jumpsuit.  And as soon as
4  we get notified that they are requesting
5  protective custody or we are notified that there
6  is a court order for their protective custody,
7  they are separated.  And from that point forward,
8  they are kept separated.
9       Q.   When detainees are directed to bullpens
10 before they're going to court, do you ever put
11 detainees in restraints or handcuffs?
12      A.   Currently now they are.
13      Q.   Currently now they are you said?
14      A.   Yes.
15      Q.   Is that something that is a recent
16 change to how things were done?
17      A.   Change happened about two years ago.
18      Q.   Do you know why that change was made?
19      A.   I believe it's because of the physical
20 altercations, but, no, I do not know the exact
21 reason.
22      Q.   And how did you learn about that
23 specific change to the procedures?
24      A.   We were told in rollcall.

Page 22

1  Q. You said told in rollcall?
2  A. Yes.
3  Q. Can you describe what that is?
4  A. Rollcall is at the beginning of the
5  shift, everybody is assigned to be there. Say I
6  work the 10:00 to 6:00 shift, everybody is
7  assigned to be there 15 minutes prior for
8  rollcall. And at that time, the lieutenant gives
9  everybody their assignments for that shift.
10         So at that point there is when
11 everybody was informed that all inmates going to
12 court have to be handcuffed.
13 Q. So at that beginning of your shift, the
14 lieutenant announces that, hey, guys, starting
15 today we are going to put everybody who comes in
16 from their divisions into handcuffs before we put
17 them in the bullpens?
18 A. No. Everybody has to come from their
19 division already in handcuffs and they would have
20 to stay in handcuffs the whole day.
21 Q. And that's the case, regardless of
22 security classification or division?
23 A. Correct.
24 Q. And that includes people who are on

Page 23

1  canes and crutches?
2  A. Canes and crutches, when they get to
3  the courthouse, they sit down on the bench and
4  then they are put in handcuffs now, yes. The only
5  exception to the rule is pregnant women.
6  Q. I'm going to, I guess, jump back to
7  sort of the receiving process and going to court.
8  So you're looking at the minimis papers when --
9  I'm sorry, let me take a step back.
10         Court services or the courtroom deputy
11 comes to receiving and says, let's get rolling,
12 we're ready to go to court for Courtroom 200. Is
13 that an accurate description?
14 A. The north side courtrooms, so 200 is in
15 that group, gets brought upstairs by the officer
16 doing escorts for the north side. So he would
17 come downstairs and say we are ready to get going.
18 So we would start on the low floors on the north
19 side and work our way up. Calling the inmates out
20 one at a time.
21         If there is only two or three for that
22 courtroom and the courtroom next door only has two
23 or three, then they would both be put together and
24 they would go up in groups like that.

Page 24

1  Q. And I'm just using 200 as a random
2  number, but it sounds like that does represent an
3  actual courtroom, so I thank you for that detail.
4         And when you're calling out the
5  detainees by name; is that correct?
6  A. Yes.
7  Q. What else happens when you call the
8  detainee by name?
9  A. I would call them out by courtroom. So
10 everybody in Courtroom 200, they would start
11 coming up, I would ask them their name, find their
12 minimis paper and then verify their ID, tell them
13 to step over, go to the next one.
14 Q. And when you say step over, are they
15 leaving the bullpen at that point?
16 A. Yes. They are leaving the bullpen,
17 going out into the corridor.
18 Q. And they are lining up outside the
19 bullpen?
20 A. Yes.
21 Q. Have you ever, to your recollection,
22 encountered a situation where a detainee has said,
23 I'm going to courtroom, again, I'm using the
24 example, just as a random number, I'm going to

Page 25

1  Courtroom 200, but his or her name doesn't appear
2  in the stack of papers that you have or they don't
3  have a court pass for that particular courtroom?
4  A. Yes, that happens.
5  Q. What do you do in that situation?
6  A. No, they do not leave the bullpen.
7  They have to wait until all the minimis papers are
8  taken care of, then we run the people that are
9  still down and find out where they are supposed to
10 go.
11 Q. In the time that you've worked in
12 receiving remember any situations where, for
13 example, a detainees court pass -- let me strike
14 that.
15         Do you remember any instances where a
16 detainee goes into a bullpen that doesn't match up
17 with their court pass?
18 A. Yes, occasionally the inmates try and
19 do that.
20 Q. What do you do in that situation?
21 A. Well, we receive the court pass and
22 direct them to the appropriate bullpen.
23 Q. Do the detainees make it into a bullpen
24 that they are not supposed to go into?

Page 26

1   A.   Not as far as I know.
2   Q.   But you're saying they try to?
3   A.   Yes.
4   Q.   How often would you say that has
5   happened while you were there?
6   A.   Once or twice a week.
7   Q.   Do you discipline the detainees somehow
8   or you just tell them, hey, you're not supposed to
9   go there, go here instead?
10  A.   We direct them to the appropriate
11  bullpen.
12  Q.   You mentioned that the policy on
13  handcuffs changed about two years ago, where now
14  from the time detainees leave their housing and
15  their division, they are put in handcuffs all the
16  way until they go to court?
17  A.   Correct.
18  Q.   Do you know at what level that change
19  or policy came from?
20  A.   I believe it came from one of the
21  directors.
22  Q.   And what is your basis for that belief?
23  A.   Like I stated before, the basis for
24  them doing that change is because of the

Page 27

1   altercations that there had been in all the
2   courtrooms between holding and receiving, all the
3   way up to the physical altercations in the
4   bullpens of the courtroom.
5   Q.   And at the beginning of that particular
6   shift about two years ago when they said -- when
7   the lieutenant said, this is how we're going to do
8   things going forward, do you remember if the
9   lieutenant said this is an order that came from
10  the director?
11       MS. BROWN:  Objection, asked and
12       answered.
13  BY MR. PATEL:
14  Q.   You can answer the question.
15  A.   I believe he did say that it came
16  from -- he did mention who it came from, but I do
17  not recall who it was.
18  Q.   Do you recall an incident, an
19  altercation that occurred on November 7th, 2016,
20  about three years ago?
21  A.   No, I do not.
22  Q.   When you were in receiving, how often
23  would you say you witnessed altercations or were
24  involved to intervene?

Page 28

1   A.   One to two every other week.
2   Q.   And after the change, where detainees
3   were kept in handcuffs through that whole process,
4   where they passed through receiving on their way
5   to court, did that -- did that number change at
6   all?
7   A.   Yes, it did.
8   Q.   How did it change, would you say?
9   A.   Less than one a month.
10       MR. PATEL:  All right, we can take a
11       break for a minute.  Go off the record.
12       THE VIDEOGRAPHER:  We are going off the
13       video record at 11:59 a.m.
14            (Break taken.)
15       THE VIDEOGRAPHER:  We are going back on
16       the video record at 12:05 p.m.
17  BY MR. PATEL:
18  Q.   Officer Oomens, before the short break
19  I had asked you whether you remembered a specific
20  incident from November 7th, 2016 and you said that
21  you didn't; is that right?
22  A.   Correct.
23  Q.   I am going to show you a video, this is
24  from November 7th, 2016.  This is previously

Page 29

1   marked as Exhibit 11.  Are you able to see it
2   okay?
3   A.   Yes.
4   Q.   So Officer, this is a video that we
5   received from your counsel.  The frame that it's
6   paused on right now is time stamped 8:49:56
7   seconds a.m., on November 7th, 2016.
8   A.   Yes, 8:49:55.
9   Q.   And just going forward you don't have
10  to confirm, I'm just sort of reading that so we
11  have it for the record.
12  A.   Well, we are looking at two separate
13  things, so I want to make sure we're looking at
14  the same thing.
15  Q.   Sure, thank you.  And over to the right
16  with the baseball cap, is that you?
17  A.   Yes, it is.
18  Q.   So this is one of the days where, I
19  guess, one or two days a week where you work
20  overtime?
21  A.   Yes.
22  Q.   And so that means you were just coming
23  off a shift, a midnight shift?
24  A.   Yes.

OFFICER JOSEPH OOMENS                                             October 30, 2019

Page 30

1  Q.  And in this frame, you see a bunch of
2  detainees lined up outside the bullpen in tan
3  jumpsuits, without handcuffs; is that right?
4  A.  Correct.
5  Q.  And this is where they would be right
6  before the courtroom deputy takes them to their
7  respective courtroom; is that right?
8  A.  Correct.
9  Q.  So I'm going to hit play now.
10      (Video played.)
11 BY MR. PATEL:
12 Q.  All right, and I just paused it at 8:50
13 and 34 seconds.  So you are standing in front of
14 the, I guess, door into the bullpen; is that
15 right?
16 A.  Correct.
17 Q.  And can you describe what you were
18 doing in the clip that we just watched?
19 A.  I was -- called out whatever courtroom
20 that was.  The inmates were coming out.  They -- I
21 asked them their name, I find their minimis paper,
22 that's what's in my hand there and I pull that to
23 the side and check their ID.  Making sure that
24 it's the right person coming out.

Page 31

1  And then I put it on the bottom of
2  stack, that way what's left in my hand is only the
3  ones I'm still waiting to come out for that
4  courtroom.
5  Q.  Okay.  And once you confirm that the ID
6  matches the name of the sheet you're looking at,
7  then you let them out of the bullpen; is that
8  right?
9  A.  Correct.
10 Q.  And after having looked at, at least
11 this short clip that we just watched, do you have
12 any specific recollection of this day?
13 A.  No, I do not.
14 Q.  And before I hit play again, the
15 gentleman at the bottom of the frame with the
16 beard and the backwards cap, do you know who he
17 is?
18 A.  He's one of the deputies from court
19 services.  I do not remember his name offhand.
20 Q.  I'll hit play again at 8:50 and 34
21 seconds.
22     (Video played.)
23 BY MR. PATEL:
24 Q.  All right, so I just paused it at 8:51

Page 32

1  and 2 seconds.  With this detainee that is
2  standing sort of in the cell, in the doorway to
3  the cell, it looks like you're walking away; is
4  that right?
5  A.  Yes.  I'm getting ready to give the
6  minimis paperwork to the deputy right here, so he
7  can bring them up to the courtroom.
8  Q.  Do you normally leave the cell door
9  open like that when you're walking away from it?
10 A.  Officer Members is standing at the cell
11 door holding on to the door itself.  And Officer
12 Brewer, in this video, is walking towards the cell
13 door to call out the next courtroom.
14 Q.  All right.  I'm going to hit play
15 again.
16     (Video played.)
17 BY MR. PATEL:
18 Q.  I paused it again at 8:51 and 13
19 seconds.  So after watching that last clip that we
20 just watched, does that refresh your memory as to
21 this particular day?
22 A.  No.
23 Q.  Can you describe what we just saw?
24 A.  The last inmate that came out of the

Page 33

1  bullpen struck the inmate that came out a couple
2  people before him in the back of the head.
3  Q.  And that inmate that got struck in the
4  back of the head, did it look like he did anything
5  to provoke the attack?
6  A.  No, it did not look like it was
7  provoked.
8  Q.  The inmate that got -- that got
9  attacked, he was in a green jumpsuit.  Do you know
10 what -- let me reask the question.
11     The inmate that was attacked was in a
12 different colored jumpsuit from the rest of the
13 inmates; is that right?
14 A.  Yes.
15 Q.  Does that color mean anything to you?
16 A.  That he's been written up for either
17 flashing himself or exposing himself to staff
18 and/or visitors.
19 Q.  And are those inmates -- let me ask it
20 a different way.
21     Are inmates that are written up for
22 what you've described, supposed to be kept
23 separate from other inmates after being written up
24 for those types of things?

Page 34
1   A.   They will be separated for going to
2  segregation, if the hearing board deems that they
3  need -- if they need to segregation for a period
4  of time.  After that, they are put back into
5  general population.  They keep the green
6  jumpsuits, but they are just in general population
7  with everybody else.
8       Q.   So if they are written up for something
9  like that, where -- how would that be recorded, I
10 guess, to your knowledge?
11      A.   It would be incident report and a
12 disciplinary report.
13      Q.   In your experience, do -- is it sort of
14 general knowledge among the detainee population
15 that wearing a green jumpsuit means what you
16 described?
17      A.   Yes.
18           MS. BROWN:  Objection, as to general
19      knowledge.
20 BY MR. PATEL:
21      Q.   And in your experience -- strike that.
22           Going back to just the process that you
23 would normally follow, in this sort of clip that
24 we just watched, you're going through the stack of

Page 35
1  papers in your hand and checking that against the
2  photo ID's of the detainees who come up to the
3  cell door to make sure that they're part of that
4  group that is supposed to be leaving; is that
5  right?
6       A.   Yes.
7       Q.   If it doesn't match or they don't show
8  you what -- strike that.
9            If the detainee, according to the stack
10 of papers that you have, shouldn't be part of that
11 group that is going, then they shouldn't leave --
12 they shouldn't be able to leave the bullpen; is
13 that right?
14      A.   Correct.
15      Q.   Have you, in your experience,
16 encountered a situation where the detainee tried
17 to leave the holding cell?
18      A.   Yes.
19      Q.   And what have you done in those
20 situations?
21      A.   Stood in front of the doorway and
22 blocked him from exiting because he was informed
23 that I don't have paperwork, he is going to have
24 to wait until I can find the appropriate paperwork

Page 36
1  so he can go where he needs to go.
2       Q.   Have you ever encountered a situation
3  where a detainee, somehow, ends up in the bullpen
4  and for an extended period of time, let's say
5  hours, doesn't get called for whatever reason and
6  is just sort of hanging out in the bullpen?
7       A.   Yes.
8       Q.   Are detainees generally -- strike that.
9            If a detainee is scheduled for court,
10 their division wouldn't bring them to receiving,
11 let's say, five hours before their scheduled court
12 time; is that accurate?
13      A.   No.
14      Q.   How far in advance could the division,
15 in your experience, bring the detainee to
16 receiving?
17      A.   The detainees can be dropped over in
18 receiving at 7:30 with the rest of the population
19 in that division and he might not have court until
20 1:00 o'clock.  The court deputies are not going to
21 take him upstairs until just before that.
22      Q.   Okay.  So a detainees could be in
23 receiving between 7:30 and 1:00, let's say, so
24 that's about, what, 6 hours?

Page 37
1       A.   Yes, five hours.
2       Q.   Will they be there overnight?
3       A.   No.
4       Q.   Has there ever been a situation where
5  detainees have somehow ended up spending the night
6  in receiving?
7       A.   No.
8       Q.   I'll represent to you, according to the
9  records we received from your counsel, the
10 detainee in the video that we just watched who got
11 attacked had a medium or lower security
12 classification and the detainee that struck him
13 had a maximum security classification.  Knowing
14 that, do you think they should have been kept in
15 the same holding cell?
16      A.   Medium and maximum are put in the same
17 holding cells all the time.
18      Q.   How about maximum and whatever
19 classification is lower than medium?
20      A.   Going to court, everybody is put in the
21 same bullpens because there is not possibly enough
22 bullpens to house all three classifications and
23 all the courtrooms separately.
24      Q.   And having watched this particular clip

Page 38

1  of this incident, is there anything you see that
2  could have been done differently to prevent it?
3        MS. BROWN:  Objection, speculation.
4        THE WITNESS:  No.
5        MR. PATEL:  Nothing further from me.
6              EXAMINATION
7  BY MS. BROWN:
8     Q.   Officer Oomens, you testified that a
9  detainee coming from a division can be in the
10 bullpen for court as early as 7:30, correct?
11    A.   Yes, ma'am.
12    Q.   And the latest court time would be 1:00
13 p.m.?
14    A.   Yes, ma'am.
15    Q.   So in your experience, how early would
16 any given division bring the detainees between
17 that time frame?
18    A.   Typically shortly after 7:00 o'clock
19 the divisions start bringing detainees over.
20    Q.   So how long -- in your experience, how
21 long has a detainee been sitting there before his
22 court appearance?
23    A.   Typically an hour to an hour and a
24 half.

Page 39

1     Q.   And having watched the video that is
2  Exhibit 11, been marked as Exhibit 11, in your
3  opinion, would you consider the incident that took
4  place around 8:51, of the two detainees having the
5  altercation, would you consider that an isolated
6  incident?
7     A.   Yes.
8        MR. PATEL:  Objection, leading.
9  BY MS. BROWN:
10    Q.   In the video, do you see any other
11 detainees responding to that altercation?
12    A.   No, I do not.
13    Q.   Prior to the altercation, and watching
14 the video, did you see any other altercations take
15 place?
16    A.   No, I did not.
17       MS. BROWN:  Could you start the video
18    for me, please?
19       MR. PATEL:  At this point?
20       MS. BROWN:  That's fine.
21       MR. PATEL:  We are starting at 8:51 and
22    13 seconds.
23           (Video played.)
24       MS. BROWN:  You can pause it.

Page 40

1  BY MS. BROWN:
2     Q.   Officer --
3        MR. PATEL:  Paused at 8:51 and 42
4    seconds.
5        MS. BROWN:  Thank you.
6  BY MS. BROWN:
7     Q.   Officer, did you see where the detainee
8  with the green jump suit was pulled from the other
9  inmate on the floor?
10    A.   Yes.
11    Q.   And do you recall, either from your
12 recollection or from seeing the video, whether the
13 detainee with the green jumpsuit was injured?
14    A.   No, I did not see any injuries on him.
15    Q.   Do you remember seeing, either from
16 your prior recollection or from seeing the video,
17 does it look like there was any blood coming from
18 that detainee?
19    A.   No.
20    Q.   After the altercation, do you remember
21 escorting that detainee -- both detainees --
22 strike that.
23          After the altercation, do you recall
24 escorting either one of those detainees to Cermak?

Page 41

1     A.   I do not recall, but according to the
2  report I escorted both detainees to Cermak.  It
3  would have been one at a time.
4        MS. BROWN:  No further questions.
5            FURTHER EXAMINATION
6  BY MR. PATEL:
7     Q.   I just have a couple questions.  You
8  said typically between the time a detainee is
9  brought in from their division in the morning or
10 before court, they are in the bullpen for an hour
11 to an hour and a half; is that right?
12    A.   Correct.
13    Q.   If you notice a detainee has been in
14 there for longer than that, would that -- would
15 that lead to you do anything?
16    A.   The process would be is that after all
17 the mins are taken care of and all the bullpens
18 are empty, there would just be a few inmates left
19 down there.  We would run them -- we would verify
20 the court date and the courtroom.
21          If they are getting new charges, they
22 would be going to bond court which starts at 1:00
23 o'clock.  So that is the inmates that would be
24 down there for the five hours because they are

Page 42

1  getting new charges.
2      Q.  So you would confirm if you saw
3  somebody longer than an hour to an hour and a half
4  to make sure that they were waiting for --
5      A.  Correct.
6      Q.  The other question I had was, you
7  mentioned in response to questions from your
8  counsel that you reviewed a report?
9      A.  Yes.
10     Q.  When did you review that report?
11     A.  It was e-mailed to me last week when I
12 was notified of this deposition.
13     Q.  So you looked at that report to prepare
14 for this deposition?
15     A.  I looked at that report trying to jog
16 my memory.
17     Q.  Did you look at any documents to jog
18 your memory?
19     A.  No, I did not.
20     Q.  I am going to hand you what was
21 previously marked as Exhibit 2.  Can you take a
22 moment to look at it?  Is this the report that you
23 reviewed last week?
24     A.  Yes, it was.

Page 43

1      Q.  Was there anything besides that report?
2      A.  No.
3      MR. PATEL:  Nothing further.
4      MS. BROWN:  I have no further
5  questions.
6      THE VIDEOGRAPHER:  We are going off the
7  video record at 12:33 p.m.
8           (Ending Time:  12:33 p.m.)

Page 44

1           REPORTER'S CERTIFICATE
2           I, BARBARA PERKOVICH, CSR No.
3  84-004070, Certified Shorthand Reporter,
4  certify:
5           That the foregoing proceedings
6  were taken before me at the time and place
7  therein set forth.  At which time the witness
8  was put under oath by me;
9           That the testimony of the
10 witness, the questions propounded, and all
11 objections and statements made at the time of
12 the examination were recorded
13 stenographically by me and were thereafter
14 transcribed;
15          That the foregoing is a true and
16 correct transcript of my shorthand notes so
17 taken.
18          I further certify that I am not a
19 relative or employee of any attorney of the
20 parties, nor financially interested in the
21 action.
22          I declare under penalty of
23 perjury under the laws of Illinois that the
24 foregoing is true and correct.

Page 45

1  Dated this 9th day of November, 2019.

        *Barbara Perkovich* (signature)
        _____
        BARBARA PERKOVICH, C.S.R. No. 84-004070

Case: 1:17-cv-01914 Document #: 125-6 Filed: 12/21/20 Page 14 of 19 PageID #:485

OFFICER JOSEPH OOMENS                                    October 30, 2019
                                                      Index: 01914..Chicago

## 0

**01914** 4:5

## 1

**10** 17:24 18:3,10, 12,14,18 19:1
**10:00** 10:5 22:6
**11** 29:1 39:2
**11:24** 4:9
**11:59** 28:13
**12** 8:21,22
**12:05** 28:16
**12:33** 43:7,8
**13** 32:18 39:22
**15** 22:7
**17** 4:5
**1:00** 36:20,23 38:12 41:22

## 2

**2** 32:1 42:21
**200** 4:12 17:16 23:12,14 24:1,10 25:1
**2016** 9:13 27:19 28:20,24 29:7
**2019** 4:8
**28** 7:18,19 8:23 13:7 14:23

## 3

**30th** 4:8
**34** 30:13 31:20
**353** 4:7

## 4

**42** 40:3
**45th** 4:7

## 6

**6** 8:19,20 36:24
**6:00** 22:6

## 7

**7:00** 38:18
**7:30** 36:18,23 38:10
**7th** 27:19 28:20,24 29:7

## 8

**8:49:55** 29:8
**8:49:56** 29:6
**8:50** 30:12 31:20
**8:51** 31:24 32:18 39:4,21 40:3

## 9

**9** 8:8,9,12 12:13,16 16:17

## A

**a.m.** 4:9 28:13 29:7
**accurate** 17:17 23:13 36:12
**actual** 24:3
**additional** 15:17
**advance** 36:14
**afternoon** 9:20
**agree** 4:14 12:11
**altercation** 27:19 39:5,11,13 40:20,23
**altercations** 21:20 27:1,3,23 39:14
**Amit** 4:17
**and/or** 18:22 33:18
**announces** 22:14
**appearance** 38:22
**appearances** 4:16
**Approximately** 8:16,21
**arrested** 10:11
**arrive** 14:13 15:10 16:20 19:6
**asses** 15:10
**assigned** 22:5,7
**assignment** 13:2 16:22
**assignments** 9:21 10:9 22:9
**assume** 6:20
**attack** 33:5
**attacked** 33:9,11 37:11
**attention** 13:24
**audio** 4:13
**aware** 20:9,15,20

## B

**back** 6:21 19:5 23:6,9 28:15 33:2,4 34:4,22
**backwards** 31:16
**Barb** 4:20
**baseball** 29:16
**based** 13:2
**basis** 26:22,23
**beard** 31:16
**beginning** 22:4,13 27:5
**belief** 26:22
**bench** 19:13 23:3
**Bianca** 4:18
**biggest** 20:11
**blocked** 35:22
**blood** 40:17
**board** 34:2
**bond** 41:22
**bottom** 31:1,15
**Boulevard** 4:12
**break** 7:4 28:11,14,18
**Brewer** 9:6 32:12
**bridge** 11:5 19:24
**bring** 11:10 32:7 36:10,15 38:16
**bringing** 38:19
**brought** 23:15 41:9
**Brown** 4:18 20:17 27:11 34:18 38:3,7 39:9,17,20,24 40:1, 5,6 41:4 43:4
**bullpen** 11:12,22 12:1 19:11,23 20:2, 7 24:15,16,19 25:6, 16,22,23 26:11 30:2,14 31:7 33:1 35:12 36:3,6 38:10 41:10
**bullpens** 10:7 11:14 13:2 14:5 16:21,23 19:8 21:9 22:17 27:4 37:21,22 41:17
**bunch** 30:1
**buses** 11:16

## C

**call** 17:21,22 24:7, 9 32:13
**called** 30:19 36:5
**calling** 17:3 23:19 24:4
**canes** 19:12,16 23:1,2
**cap** 29:16 31:16
**care** 9:19 11:6 25:8 41:17
**carrying** 15:16
**case** 9:7,10,12 22:21
**category** 18:13
**cell** 32:2,3,8,10,12 35:3,17 37:15
**cells** 37:17
**Cermak** 40:24 41:2
**certified** 4:19
**cetera** 6:8
**change** 15:3 16:11 21:16,17,18, 23 26:18,24 28:2,5, 8
**changed** 26:13
**charges** 41:21 42:1
**check** 11:24 12:2 14:12 15:14 30:23
**checked** 11:11
**checking** 11:19 15:10 35:1
**Chicago** 4:8,12

U.S. Legal Support, Inc.
(312) 236-8352

**clarify** 6:23
**Clark** 4:7
**classification** 12:19 13:5 22:22 37:12,13,19
**classifications** 12:10 37:22
**classified** 10:8
**clip** 30:18 31:11 32:19 34:23 37:24
**Close** 5:13
**color** 33:15
**colored** 33:12
**communicate** 16:5
**communications** 16:8
**completely** 6:1 7:11
**confirm** 29:10 31:5 42:2
**consideration** 13:4
**Cook** 4:4 7:17 8:3,7
**correct** 7:14,15 10:15 12:15,16 17:18 20:8 22:23 24:5 26:17 28:22 30:4,8,16 31:9 35:14 38:10 41:12 42:5
**corridor** 24:17
**counsel** 4:14,15 9:4 29:5 37:9 42:8
**County** 4:4 7:17 8:3,7
**couple** 33:1 41:7
**court** 4:19 5:21 6:2,4,21 11:6,9,11 12:2,4 13:3,13,19 14:10,12 15:10,14 16:22 17:1,4 20:13, 16 21:6,10 22:12

23:7,10,12 25:3,13, 17,21 26:16 28:5 31:18 36:9,11,19,20 37:20 38:10,12,22 41:10,20,22
**courthouse** 23:3
**courtroom** 12:3 13:2 17:3,8,16 23:10,12,22 24:3,9, 10,23 25:1,3 27:4 30:6,7,19 31:4 32:7, 13 41:20
**courtrooms** 11:15 14:4 23:14 27:2 37:23
**courts** 11:17
**crutches** 19:12, 16 23:1,2
**custody** 19:19, 22 20:1,3,6,10,12, 14,16,23 21:1,2,5,6
**CV** 4:5

**D**

**date** 41:20
**day** 9:22 10:22,23 11:4 22:20 31:12 32:21
**days** 10:21 29:18, 19
**decided** 16:11
**deems** 34:2
**Defendant** 4:18
**depending** 12:7 16:1,22
**deposed** 5:9
**deposition** 4:3, 6 5:10 9:2,7,10 42:12,14
**depositions** 5:19
**deputies** 31:18 36:20

**deputy** 17:8 23:10 30:6 32:6
**describe** 9:16 11:7 17:19 19:21 22:3 30:17 32:23
**description** 23:13
**detail** 17:20 24:3
**detainee** 13:18 15:15 18:13 19:7,10 20:1,12,14,22 24:8, 22 25:16 32:1 34:14 35:9,16 36:3,9,15 37:10,12 38:9,21 40:7,13,18,21 41:8, 13
**detainee's** 14:12
**detainees** 12:9, 17,24 13:12 14:7 15:10 16:20,23 18:3,16,18 19:1,6,8, 11,12 20:3,6 21:9, 11 24:5 25:13,23 26:7,14 28:2 30:2 35:2 36:8,17,22 37:5 38:16,19 39:4, 11 40:21,24 41:2
**determine** 12:1
**differently** 6:24 38:2
**Dionte** 4:4
**direct** 16:21 19:8 25:22 26:10
**directed** 21:9
**directing** 13:1
**director** 16:1 27:10
**directors** 26:21
**disciplinary** 34:12
**discipline** 26:7
**discussions** 9:3

**division** 8:8,9,12, 19,20 11:22 12:7, 13,16 13:18 16:17, 20 17:24 18:3,10, 12,14,18 19:1,6 22:19,22 26:15 36:10,14,19 38:9,16 41:9
**divisions** 11:10 12:9 13:1 14:8,13 22:16 38:19
**document** 14:11
**documents** 14:2 42:17
**door** 23:22 30:14 32:8,11,13 35:3
**doorway** 32:2 35:21
**downstairs** 23:17
**dropped** 36:17
**duly** 5:2
**duties** 10:23

**E**

**e-mail** 16:9
**e-mailed** 42:11
**e-mails** 16:10
**early** 38:10,15
**empty** 41:18
**encountered** 24:22 35:16 36:2
**ended** 37:5
**ending** 43:8
**ends** 36:3
**entire** 8:4,23
**entitled** 9:22
**escorted** 41:2
**escorting** 40:21, 24

**escorts** 23:16
**et al** 4:5
**exact** 21:20
**EXAMINATION** 5:4 38:6 41:5
**examined** 5:2
**exception** 23:5
**Exhibit** 29:1 39:2 42:21
**exiting** 35:22
**expected** 5:24
**experience** 34:13,21 35:15 36:15 38:15,20
**exposing** 33:17
**extended** 36:4

**F**

**familiar** 19:18
**find** 24:11 25:9 30:21 35:24
**fine** 39:20
**finish** 6:12,14 10:6
**finished** 10:13
**flashing** 33:17
**floor** 4:7 40:9
**floors** 23:18
**flush** 19:2
**flushed** 18:6
**follow** 13:14 15:3 16:20 34:23
**forgive** 13:11
**forward** 21:7 27:8 29:9
**frame** 29:5 30:1 31:15 38:17
**front** 5:21 30:13 35:21

OFFICER JOSEPH OOMENS                                          October 30, 2019
                                                        Index: full..multiple

**full** 5:7

### G

**general** 34:5,6, 14,18
**generally** 16:6 18:21 36:8
**gentleman** 31:15
**give** 5:18 6:7 15:6 32:5
**Good** 4:1 5:6
**great** 7:3,13
**green** 33:9 34:5, 15 40:8,13
**ground** 5:19
**group** 23:15 35:4, 11
**groups** 23:24
**guess** 10:2 23:6 29:19 30:14 34:10
**guys** 22:14

### H

**half** 38:24 41:11 42:3
**hand** 30:22 31:2 35:1 42:20
**handcuffed** 22:12
**handcuffs** 21:11 22:16,19,20 23:4 26:13,15 28:3 30:3
**hanging** 36:6
**happened** 15:7 21:17 26:5
**harder** 6:10
**head** 33:2,4
**hear** 6:22

**hearing** 34:2
**held** 7:16
**hey** 22:14 26:8
**hit** 30:9 31:14,20 32:14
**hold** 18:12
**holding** 11:5 27:2 32:11 35:17 37:15,17
**hour** 38:23 41:10, 11 42:3
**hours** 36:5,11,24 37:1 41:24
**house** 37:22
**housing** 9:21 10:1,2,8 13:13 26:14
**hypothetical** 15:13

### I

**ID** 17:23 24:12 30:23 31:5
**ID's** 11:13,24 17:24 18:4,6,7 19:2 35:2
**Illinois** 4:8,13
**incident** 9:12 27:18 28:20 34:11 38:1 39:3,6
**includes** 22:24
**information** 15:15
**informed** 22:11 35:22
**informs** 17:4
**injured** 40:13
**injuries** 40:14
**inmate** 18:1 20:24 21:2 32:24 33:1,3,8,11 40:9

**inmates** 9:21,24 10:1,3 11:6,8 17:2, 23 18:5,16 19:22 22:11 23:19 25:18 30:20 33:13,19,21, 23 41:18,23
**instances** 25:15
**intervene** 27:24
**involved** 27:24
**isolated** 39:5
**issues** 18:19,24

### J

**Jackson** 4:12
**jail** 8:4,7 13:7
**job** 9:22
**jog** 42:15,17
**Joseph** 4:3 5:1,8
**judge** 5:22 20:21
**jump** 23:6 40:8
**jumpsuit** 21:3 33:9,12 34:15 40:13
**jumpsuits** 30:3 34:6

### K

**Kelly** 4:10
**kind** 16:14
**Knowing** 37:13
**knowledge** 6:1 34:10,14,19

### L

**lastly** 7:3
**latest** 38:12
**lead** 41:15
**leading** 39:8

**learn** 13:14 15:4, 18 21:22
**learned** 14:15
**leave** 25:6 26:14 32:8 35:11,12,17
**leaving** 24:15,16 35:4
**left** 9:20 31:2 41:18
**Legal** 4:11
**level** 26:18
**lieutenant** 15:24 16:11,12 22:8,14 27:7,9
**lined** 30:2
**lining** 24:18
**list** 14:4
**listed** 13:3
**located** 4:11
**location** 11:11, 14,20
**long** 7:16,22 8:9, 14 38:20,21
**longer** 41:14 42:3
**looked** 31:10 42:13,15
**lose** 19:1
**lost** 18:6
**lot** 18:5,14,15,16
**low** 23:18
**lower** 37:11,19

### M

**made** 21:18
**make** 6:2,6,12,13, 16 7:1,4,6 8:22 11:19 25:23 29:13 35:3 42:4
**makes** 7:8
**making** 11:20 18:7 30:23

**male** 11:5
**marked** 29:1 39:2 42:21
**match** 25:16 35:7
**matches** 31:6
**matter** 4:3
**max** 12:20,21,22
**maximum** 12:17 37:13,16,18
**means** 29:22 34:15
**medical** 18:14, 18,22,24
**medium** 12:20, 21,22 37:11,16,19
**Members** 32:10
**memory** 32:20 42:16,18
**mention** 27:16
**mentioned** 14:7 26:12 42:7
**midnight** 9:19, 23 10:18,24 29:23
**military** 7:21,23
**minimis** 17:2,10 18:2 23:8 24:12 25:7 30:21 32:6
**minimize** 19:13
**mins** 41:17
**minute** 28:11
**minutes** 22:7
**moment** 42:22
**month** 28:9
**months** 8:11
**morning** 4:1 5:6 41:9
**multiple** 20:6

**N**

**names** 17:21,22
**needed** 10:7
**night** 10:6 37:5
**nods** 6:8
**north** 4:7 23:14, 16,18
**notice** 41:13
**notified** 21:4,5 42:12
**November** 9:13 27:19 28:20,24 29:7
**number** 18:1 24:2,24 28:5

**O**

**oath** 5:20
**Objection** 20:17 27:11 34:18 38:3 39:8
**occasionally** 20:13 25:18
**occurred** 27:19
**October** 4:8
**offhand** 31:19
**Office** 4:5
**officer** 5:1,6,9 7:14 9:6 17:6 23:15 28:18 29:4 32:10,11 38:8 40:2,7
**officers** 14:11 16:4
**Oomens** 4:3 5:1, 8,9 28:18 38:8
**open** 32:9
**opinion** 39:3
**orange** 21:3
**order** 20:13,16,22 21:6 27:9

**outlying** 11:17
**overnight** 37:2
**overtime** 10:22 29:20

**P**

**p.m.** 28:16 38:13 43:7,8
**paper** 24:12 30:21
**papers** 17:11,20 23:8 25:2,7 35:1,10
**paperwork** 17:2 18:2 32:6 35:23,24
**part** 35:3,10
**pass** 11:11 12:2,4 13:3 14:10 15:14 25:3,13,17,21
**passed** 15:19 28:4
**passes** 14:12
**Patel** 4:17 5:5 20:18 27:13 28:10, 17 30:11 31:23 32:17 34:20 38:5 39:8,19,21 40:3 41:6 43:3
**pause** 39:24
**paused** 29:6 30:12 31:24 32:18 40:3
**paying** 13:24
**pending** 7:5
**people** 10:10 19:15 22:24 25:8 33:2
**period** 14:24 34:3 36:4
**Perkovich** 4:20
**person** 16:2 30:24
**photo** 35:2

**physical** 21:19 27:3
**picked** 11:16
**piece** 15:15
**place** 4:6,14 9:13 39:4,15
**Plaintiff** 4:17
**Plant** 9:10
**play** 30:9 31:14,20 32:14
**played** 30:10 31:22 32:16 39:23
**point** 14:22 21:7 22:10 24:15 39:19
**policy** 26:12,19
**population** 34:5,6,14 36:18
**possibly** 37:21
**pregnant** 23:5
**prepare** 9:1 42:13
**prevent** 38:2
**previously** 28:24 42:21
**prior** 10:16 22:7 39:13 40:16
**procedures** 15:2 21:23
**process** 10:4 12:6 13:14,16,19 14:17 16:19 19:5 23:7 28:3 34:22 41:16
**processing** 10:4,14 13:12
**proper** 11:12,20, 22
**protective** 19:19,22 20:1,3,6, 10,12,14,16,22 21:1,2,5,6
**provoke** 33:5

**provoked** 33:7
**psych** 18:22
**psychological** 18:24
**pull** 30:22
**pulled** 40:8
**put** 10:7 11:12 20:14,22 21:10 22:15,16 23:4,23 26:15 31:1 34:4 37:16,20

**Q**

**question** 6:7,12, 15,19,22 7:5 15:5 20:19 27:14 33:10 42:6
**questions** 5:23 9:14 41:4,7 42:7 43:5

**R**

**random** 24:1,24
**read** 6:21
**reading** 29:10
**ready** 11:15 17:1, 5 23:12,17 32:5
**reask** 33:10
**reason** 7:9 19:7, 9,15 20:11 21:21 36:5
**reasons** 20:9,15
**recall** 27:17,18 40:11,23 41:1
**receive** 25:21
**received** 29:5 37:9
**receiving** 8:13, 14,15 9:16,17,18 13:10 14:12,19,22 16:15 17:13 19:24 23:7,11 25:12 27:2,

22 28:4 36:10,16, 18,23 37:6
**recent** 14:23 21:15
**recently** 16:15
**recollection** 24:21 31:12 40:12, 16
**record** 4:2,15,16 5:7 7:6 28:11,13,16 29:11 43:7
**recorded** 34:9
**recording** 4:13 6:5
**records** 37:9
**refer** 14:3
**referring** 11:20
**refresh** 32:20
**refresher** 5:18
**remember** 5:15, 16 8:18 16:14 25:12,15 27:8 31:19 40:15,20
**remembered** 28:19
**rephrase** 15:5
**report** 34:11,12 41:2 42:8,10,13,15, 22 43:1
**reporter** 4:20 6:4,21
**represent** 24:2 37:8
**requested** 20:12
**requesting** 21:4
**require** 20:16
**respective** 30:7
**respond** 6:13 7:10
**responding** 39:11

**response** 6:8,14 42:7
**responsibilities** 10:24
**responsible** 13:11 15:17
**rest** 19:10 33:12 36:18
**restraints** 21:11
**review** 42:10
**reviewed** 42:8, 23
**rid** 19:1
**role** 9:17,18
**rollcall** 21:24 22:1,4,8
**rolling** 17:7 23:11
**rule** 23:5
**rules** 5:19
**run** 25:8 41:19

**S**

**sanitation** 9:23
**sat** 5:10
**scanned** 11:13
**scheduled** 36:9, 11
**seconds** 29:7 30:13 31:21 32:1,19 39:22 40:4
**security** 12:10, 17,19 13:4 22:22 37:11,13
**segregation** 34:2,3
**sense** 6:2,17 7:1, 7,8
**separate** 19:10, 23 29:12 33:23
**separated** 21:7, 8 34:1

**separately** 37:23
**sergeant** 9:10 15:24 16:12
**sergeants** 16:3, 5
**services** 17:1,4 23:10 31:19
**set** 19:13
**sheet** 31:6
**Sheriff** 7:17
**Sheriff's** 4:4
**shift** 9:19,20,23 10:16,18,22,23 11:1,4 22:5,6,9,13 27:6 29:23
**shifts** 10:17
**short** 28:18 31:11
**shortly** 38:18
**show** 17:23 28:23 35:7
**shows** 13:18
**side** 19:13 23:14, 16,19 30:23
**sit** 23:3
**sitting** 38:21
**situation** 24:22 25:5,20 35:16 36:2 37:4
**situations** 25:12 35:20
**six-year** 14:23
**solely** 12:17
**sort** 5:18 23:7 29:10 32:2 34:13,23 36:6
**sounds** 24:2
**specific** 18:12 21:23 28:19 31:12
**speculation** 20:17 38:3

**spending** 37:5
**spoken** 9:6,9
**stack** 17:15 25:2 31:2 34:24 35:9
**staff** 16:3 33:17
**stamped** 29:6
**standing** 30:13 32:2,10
**start** 10:5 17:2 23:18 24:10 38:19 39:17
**started** 13:10
**starting** 22:14 39:21
**starts** 41:22
**state** 4:15 5:6
**stated** 26:23
**stay** 11:14 22:20
**step** 15:16,17 23:9 24:13,14
**Stood** 35:21
**Street** 4:7
**strike** 12:5,23 18:10,11 25:13 34:21 35:8 36:8 40:22
**struck** 33:1,3 37:12
**suit** 40:8
**superintendent** 15:24
**supervisor** 15:22
**supervisors** 15:20,21
**supervisors'** 15:22
**supervisory** 16:3
**Support** 4:11

**supposed** 14:3 15:3,14 21:1 25:9, 24 26:8 33:22 35:4
**swear** 4:20
**sworn** 4:22 5:2,20

**T**

**takes** 30:6
**taking** 4:6,14 6:5 9:19 11:5
**talked** 16:19
**talking** 6:16 10:10 13:20
**tan** 30:2
**ten** 5:13,14
**term** 13:12 19:18
**testified** 5:3 38:8
**testifying** 5:20
**thing** 29:14
**things** 15:9 21:16 27:8 29:13 33:24
**Tim** 4:10
**time** 8:4 9:15 10:5 22:8 23:20 25:11 26:14 29:6 34:4 36:4,12 37:17 38:12,17 41:3,8 43:8
**times** 10:17
**title** 7:13,16 15:22
**today** 7:11 22:15
**toilet** 18:6 19:2
**told** 16:3 21:24 22:1
**truthfully** 5:24 7:10
**types** 33:24
**typically** 11:4 38:18,23 41:8

**U**

**U.S.** 4:11
**uh-huhs** 6:8
**understand** 6:23 15:8
**understood** 6:20
**unique** 18:9
**updated** 15:3
**upstairs** 23:15 36:21

**V**

**variety** 18:16
**verbal** 6:7
**verbally** 16:6
**verify** 17:23 24:12 41:19
**versus** 4:4
**video** 4:13 28:13, 16,23 29:4 30:10 31:22 32:12,16 37:10 39:1,10,14, 17,23 40:12,16 43:7
**visitors** 33:18

**W**

**wait** 25:7 35:24
**waiting** 31:3 42:4
**walk** 19:14
**walking** 32:3,9, 12
**watched** 30:18 31:11 32:20 34:24 37:10,24 39:1
**watching** 32:19 39:13

**wearing** 34:15

**week** 10:21 26:6
  28:1 29:19 42:11,23

**West** 4:12

**whichever**
  11:13

**wings** 18:15

**witnessed** 27:23

**women** 23:5

**work** 8:6 10:5,17
  12:13 14:22 22:6
  23:19 29:19

**worked** 25:11

**working** 8:3 9:18
  13:7,10,23 14:11,16

**writing** 6:11 16:9

**written** 18:2
  33:16,21,23 34:8

---

Y

---

**years** 5:13,14
  7:18,19,24 8:1,16,
  17,21,22,23 9:14
  13:7 14:20,23 21:17
  26:13 27:6,20

**yellow** 21:3

**Young** 4:4