UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIONTE YOUNG,                           )
                                        )
            Plaintiff,                  )      Case No. 17-cv-1914
                                        )
      v.                                )      Hon. Steven C. Seeger
                                        )
THOMAS J. DART, Cook County             )
Sheriff, *et al.*,                      )
                                        )
            Defendants.                 )
_____)

## MEMORANDUM OPINION AND ORDER

A detainee sucker punched Plaintiff Dionte Young when they were headed to court from the Cook County Jail. The attacker hit him in the face, and they grappled as several Sheriff's officers jumped in and broke up the fight. Young ended up with a scrape on his upper lip and an injury to his hand.

Young later sued the officers in their individual capacities, and Sheriff Dart in his official capacity. He brings three claims. He alleges that they failed to intervene, and failed to protect him from the attack. He brings a *Monell* claim against the Sheriff, too.

Defendants moved for summary judgment on all three claims. For the reasons that follow, the motion is granted.

### Background

The attack took place on November 7, 2016. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 125). Plaintiff Dionte Young was detained at the Cook County Jail, awaiting trial for aggravated domestic battery, aggravated battery, domestic battery, and unlawful

restraint. *Id.* at ¶¶ 9–10. The parties disagree about how long Young had been detained, but for present purposes, it makes no difference. *Id.* at ¶ 9.

On the day of the attack, Young had a scheduled court appearance. *Id.* at ¶ 12. The Sheriff's Office handled court appearances by transferring detainees to a "holding bullpen" in the criminal court building, which is basically a large cell that holds dozens of detainees at once. *Id.* The detainees wait in that cell until the staff called their courtroom. *Id.*; *see also id.* at ¶ 14. At that point, the detainees hand their passes to the officer at the door, and then line up outside the bullpen. *Id.* at ¶ 14.

The process takes some time. The parties dispute how long each detainee typically spends in the bullpen, but it could range from ten minutes to six hours. *Id.* In the meantime, the detainees were not handcuffed or otherwise restrained. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 132).

That day, the bullpen contained 50 to 60 detainees. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 125). Before entering the bullpen, officers searched all detainees for weapons by patting them down and using body scan machines. *Id.* at ¶ 15. As they entered the bullpen, one of the officers (Officer Members) collected each detainee's court pass. *Id.* at ¶ 16.

The record includes video footage from the day of the attack. The camera was in the corner of the room, near the ceiling, and was pointed in the direction of the bullpen. It provided a clear view of what unfolded.

Young entered the bullpen at 8:39:00 a.m., a little more than 10 minutes before the attack. *See* Division 5 Bullpen Video, at 8:38:57 to 8:39:04 (Dckt. No. 116-6);[1] Pl.'s Resp. to

---

[1] With his statement of additional facts, Young provided another video of the bullpen from a different angle. *See* Security Camera Video (Dckt. No. 125-19). The Court has reviewed the video, but the footage does not contain anything material that cannot be seen on the overhead view provided by

Defs.' Statement of Facts, at ¶¶ 17, 20 (Dckt. No. 125) (the parties identified Young as the detainee wearing a green jumpsuit). The attacker, Manuel Gama, was already in the bullpen when Young entered. *See* Division 5 Bullpen Video, at 8:36:05 to 8:50:05. At the very beginning of the video, Gama is visible in the bottom left corner of the screen, sitting on a bench in the corner of the bullpen before he got up to exit. *Id.*

When one of the officers called for detainees to line up for court, Gama stood up and headed toward the middle of the bullpen. *Id.* at 8:50:03-21. Meanwhile, Young approached the door of the bullpen to line up. *Id.* at 8:50:27-29. He took a piece of paper out of a folder he was carrying and handed it to Officer Oomens. *Id.* at 8:50:29-50. He left the large holding cell and got in line behind other detainees in the hallway. *Id.*

Gama headed toward the door soon after, took something out of his pocket, and dropped it on the ground. *Id.* at 8:50:48 to 8:51:00. He didn't end up giving any paper (or court pass) to the officer. *Id.* Officer Oomens let him out of the bullpen, and turned around. *Id.* at 8:51:00-04. Gama got in line directly behind Young. *Id.*

At that moment, four officers were standing just outside the bullpen. *Id.* But the parties aren't on the same page about who was there. The parties agree that Officers Brewer, Oomens, and Members were standing nearby. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 125). There was a fourth officer, too, but the parties disagree about who it was. Young believes that it was Deputy Aquino, but the officers say that it was Officer Sanchez. *Id.*

All of a sudden, Gama struck Young from behind. *See* Division 5 Bullpen Video, at 8:51:05-06 (Dckt. No. 116-6). Young's body was facing forward, toward the front of the line. His face was turned to the left as he talked with an officer. That's when Gama swung his left fist

---

Defendants. So the Court cites to the Division 5 Bullpen Video (Dckt. No. 116-6), which is longer and provides a better view of the attack and the officers' response.

and hit Young in the face. He threw three punches, and then wrapped his arms around Young's head. *Id.* at 8:51:05-07.

Officer Brewer was only a few feet away, and he sprung to action. One second after the first punch, Officer Brewer grabbed Gama. *Id.* at 8:51:06-07; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 125). Officer Brewer attempted to pull Gama away from Young. But the altercation continued. Gama still had both arms wrapped around Young's head and neck, and Young had his arms wrapped around Gama's waist. *See* Division 5 Bullpen Video, at 8:51:07-08 (Dckt. No. 116-6).

Three seconds after Gama threw the first punch, two other officers got involved. Officer Oomens and a second officer (Officer Sanchez or Deputy Aquino) jumped in. They placed their hands on the skirmishing detainees. *Id.* at 8:51:08.

As the detainees were grappling, they went to the ground. *Id.* at 8:51:08-11. The officers appear to have slowed their descent, cushioning their fall. All three officers then attempted to pry Young and Gama away from one another. *Id.* at 8:51:11-20. While the three officers struggled to separate them, a fourth officer (Officer Members) also got involved. *Id.* at 8:51:20-22. One officer tried to peel Young off by pulling on his leg.

Before long, the four officers successfully pulled Gama and Young apart, breaking up the fight. *Id.* at 8:51:22-35. The altercation was over within 30 seconds. *Id.* at 8:51:05-35; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 26–27 (Dckt. No. 125).

The officers placed both detainees in handcuffs and brought them to urgent care for medical attention. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 28, 30 (Dckt. No. 125). Young received treatment for an abrasion "to his upper inner lip." *Id.* at ¶ 31. The doctor ordered him to rinse his mouth with water, applied an ointment, and prescribed Ibuprofen. *Id.*

4

Though he now reports that he suffered an injury to his left hand, Young did not receive treatment for a hand injury that day. *Id.* He also did not report such an injury in his grievance form. *Id.* at ¶ 37; *see also* Young Dep., at 21:21 – 22:3 (Dckt. No. 116-3).

Gama did not use a weapon to attack Young. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 125); *see also* 11/7/16 Incident Report (Dckt. No. 116-7) (as noted in the incident details section, the box titled "Weapon(s) Involved" is unchecked). In his deposition, Young initially suggested that Gama may have had some kind of object, although not a weapon, in his closed fist. *See* Young Dep., at 17:11-18 (Dckt. No. 116-3) ("It seemed like some type of closed object, but it was a closed hand . . . . I don't know what it was he had in his hand, but he hit me with something where I felt it."). But he later confirmed that he was hit by Gama's fist. *Id.* at 18:2-5 (confirming, in response to a question, that Gama attacked him "with his closed hand" which "he would classify [] as a fist").

The attack was "unexpected[]." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 125). Gama attacked Young "for no reason." *Id.* But Young claims that they "had a history." *Id.* at ¶ 35. The parties dispute the extent of a "history" between Young and Gama. *Id.* Young's own testimony is not consistent, but he states that he once observed Gama "tampering with a metal vent in [a] holding cell located in the CCB [Criminal Courts Building] . . . and stated that he was going to tell if [Gama] did not stop." *Id.*; *see also* 11/7/16 Incident Report (Dckt. No. 116-7). Another time, Young observed Gama "being vulgar to a female officer and hiding a weapon in one of the cells" in the criminal court building. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 35.

After the attack, Young refused protective custody. *Id.* at ¶ 36.

Young filed this lawsuit in February 2017, a few months after the attack. *See* Cplt. (Dckt. No. 1). He amended his complaint twice. *See* First Am. Cplt. (Dckt. No. 29); Second Am. Cplt. (Dckt. No. 38).

The second amended complaint includes three claims against Sheriff Dart, Officer Oomens, Officer Sanchez, and Does 1-5. Count I is a failure-to-intervene claim against the officers. Count II is a failure-to-protect claim against the officers. Count III is a *Monell* claim against Sheriff Dart for the policies, practices, and customs that allegedly caused his injuries.

The filings create a bit of confusion about who, exactly, is at issue in the pending motion for summary judgment. Again, the second amended complaint included claims against unidentified "Doe" defendants. But Young did not file a third amended complaint, so he never identified them.

Under the Federal Rules, parties must be named in a complaint and served with process within 90 days. *See* Fed. R. Civ. P. 10(a); Fed. R. Civ. P. 4(m). Courts give greater allowances to plaintiffs when they don't know the identities of the would-be defendants, and rightly so. Sometimes a plaintiff needs discovery first.

Still, there must come a time when a would-be defendant is identified and brought into a case. Plaintiff filed this case in 2017, and the time to identify new parties has long since passed. Discovery is closed, and Young has not attempted to bring any other officers into the mix and add them as named defendants. So the Doe defendants are hereby dismissed.

Sheriff Dart, Officer Oomens, and Officer Sanchez later filed a motion for summary judgment. *See* Mtn. (Dckt. No. 114). Officer Brewer, Officer Members, and Sergeant Plante joined the motion, too, even though they are *not* named defendants. *Id.* ("NOW COMES

Defendants, Sheriff Thomas Dart, Officer M. Brewer, Officer J. Oomens, Officer A. Sanchez, Officer A. Members, and Sergeant J. Plante . . . .").

In response to the motion for summary judgment, Young makes arguments about only Sheriff Dart and Officer Oomens. He argues that Officer Sanchez isn't the guy in the video, and thus undercuts any basis for suing him. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 125). He also does not make any argument or present any facts that could give rise to a triable claim against Officer Brewer, Officer Members, or Sergeant Plante.[2]

The bottom line is that Officer Brewer, Officer Members, and Sergeant Plante aren't parties. But even if they were defendants, they would be entitled to summary judgment, just like Sheriff Dart, Officer Oomens, and Officer Sanchez.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute about any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go

---

[2] During the initial hearing after reassignment, Plaintiff's counsel floated the possibility of amending the complaint to correct the identity of a defendant. *See* 10/25/19 Order (Dckt. No. 86). This Court required a motion (*id.*), but Plaintiff filed none. Since then, Young did not request or receive leave to amend the complaint.

beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *Celotex Corp.,* 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Discussion

Defendants moved for summary judgment on the failure-to-intervene and failure-to-protect claims, and on the *Monell* claim for those alleged violations. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 3–15 (Dckt. No. 115). Before diving in, the Court pauses to clarify the constitutional provision at issue.

Young was a pretrial detainee, not a prisoner. So the Fourteenth Amendment, not the Eighth Amendment, applies. *See Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). The Eighth Amendment applies to cruel and unusual "punishment," and a pretrial detainee by definition has not received "punishment." *See* U.S. Const. amend. VIII; *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Fourteenth Amendment governs mistreatment of pretrial detainees during their pre-punishment incarceration. *See Kingsley v. Hendrickson*, 576 U.S. 389, 401 (2015).

In his complaint, Young asserts his right to be free from cruel and unusual punishment under the Eighth Amendment. *See* Second Am. Cplt., at Counts I & II (Dckt. No. 38).

8

Defendants did not move for summary judgment based on the notion that Young cited the wrong constitutional provision. Instead, they treated the complaint as if it raised a claim under the Fourteenth Amendment. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 3 (Dckt. No. 115).

So the Court will too. The Court will treat the complaint as if Young had raised a claim under the Due Process Clause of the Fourteenth Amendment, even though it invoked the Eighth Amendment. That pragmatic approach is within the spirit (albeit not the letter, given the use of the word "tried") of Rule 15. *See* Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").

## I.     Failure to Intervene

In Count I, Young claims that the officers "failed to intervene to prevent the violation of Plaintiff's constitutional rights."[3] *See* Second Am. Cplt., at ¶ 20 (Dckt. No. 38). Defendants argue that the undisputed facts show that they did, in fact, intervene, and therefore Young has no claim. *See* Defs.' Mem. in Supp. of Summ. J., at 9–10 (Dckt. No. 115). The Court agrees.

For starters, Young's claim fails because there was no underlying constitutional violation. A party can bring a failure-to-intervene claim when an officer had a "realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights," but failed to do so. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). "In order for there to be a failure to

---

[3] Again, the Court notes that Young has not been entirely clear about which Sheriff's officers are defendants in this case. In his second amended complaint, he named the Sheriff, Officers Oomens and Sanchez, and five unidentified officers. *See* Second Am. Cplt., at ¶¶ 4–6 (Dckt. No. 38). In response to Defendants' statement of facts, Young states that Officers "Brewer, Members, Plante, and Sanchez are not named defendants." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 2 (Dckt. No. 125). That statement is not quite right, because the second amended complaint does name Sanchez as a defendant. But Young suggests that Officer Sanchez *shouldn't* be a defendant. Indeed, Young disputes that Officer Sanchez is one of the officers outside of the bullpen to begin with. *Id.* at ¶ 18. Even if Young intended to sue a broader group, the video shows that the officers did not fail to intervene in the attack.

intervene, it logically follows that there must be an underlying constitutional violation . . . ." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *see also Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004). A failure-to-intervene claim is not about any run-of-the-mill failure to help. A failure-to-intervene claim is about a failure to step in when another state actor is violating the plaintiff's rights.

Here, Young has not come forward with evidence that there was an underlying constitutional violation. As explained in the section that follows, Young has no claim that the officers violated a duty to protect. And without an underlying constitutional violation, there is no failure-to-intervene claim. There was no violation to prevent in the first place.

Young's failure-to-intervene claim cannot survive for other reasons, too. To succeed on a failure-to-intervene claim, a plaintiff must demonstrate that jail officials had a "realistic opportunity to step forward" but "fail[ed] to do so." *See Harper*, 400 F.3d at 1064; *Wilson v. Cook County*, 2020 WL 5642945, at *3 n.2 (N.D. Ill. 2020); *Hoskins v. Dilday*, 2016 WL 4039850, at *6 (S.D. Ill. 2016); *cf. Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007) ("A prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy.").

The video tells the story, and shows that Young has no claim. One officer intervened within a split second. Two other officers responded within three seconds. So, a mere three seconds after the punch, three officers were attempting to break up a fight between two detainees.

Specifically, Gama struck Young at 8:51:05 a.m. *See* Division 5 Bullpen Video, at 8:51:05-06 (Dckt. No. 116-6). Only one second later, Officer Brewer grabbed Gama from

10

behind. *Id.* at 8:51:06. Only three seconds after the first punch, three officers had joined the fray, trying to break it up. *Id.* at 8:51:08. A fourth officer got involved 15 seconds after the punch. *Id.* at 8:51:20. Within 30 seconds, the officers broke up the fight, separated Gama and Young, and started placing Gama in handcuffs. *Id.* at 8:51:05-35. That's a lot of action in a short period of time.

Young does not muster a response. He does not argue that the officers did not intervene quickly enough, or that they didn't intervene at all. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J. (Dckt. No. 124). In fact, Young's brief only mentions the officers' intervention, not any *failure* to intervene. *Id.* at 3 ("Plaintiff reacted quickly to defend himself, and officers had to intervene to separate Gama from Plaintiff Young after Young had been attacked.").

Young admits that "Plaintiff was unexpectedly attacked from behind" and that "officers immediately rushed in to break up the fight." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 33–34 (Dckt. No. 125). Young himself testified that in light of Gama's "sneak attack," the officers "really couldn't do too much when he attacked me." *See* Young Dep., at 17:24 – 18:8 (Dckt. No. 116-3). "But when he attacked me, they like rushed in. They rushed in." *Id.* at 18:8-9.

Those admissions doom the claim. The officers didn't failure to intervene. Quite the opposite. They "immediately rushed in to break up the fight." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 33–34 (Dckt. No. 125).

The Constitution does not require correctional officers to have cat-like reflexes, and in any event, the video shows that the guards responded in a matter of seconds. It's difficult to imagine how the officers could have intervened more quickly.

The undisputed facts show that the officers intervened as quickly as possible. No reasonable jury could find that the officers failed to intervene and break up the fight. The Court grants Defendants' motion for summary judgment on Count I.

## II.     Failure to Protect

Defendants also move for summary judgment on Young's failure-to-protect claim (Count II). *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 3–7 (Dckt. No. 115). Defendants argue that Young cannot establish that the risk of harm was substantial, or that the officers had notice of the attack, or that they acted unreasonably. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 3 (Dckt. No. 115). Before considering the facts, the Court reviews the standard for a failure-to-protect claim under the Fourteenth Amendment in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

### A.     The Standard

Jail officials have a duty to take "reasonable measures to guarantee the safety of the inmates." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). That duty includes "protect[ing] prisoners from violence at the hands of other prisoners." *Id.* at 833; *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) ("Jail officials have a duty to protect inmates from violent assaults by other inmates."). The power to incarcerate comes with the duty to protect.

But a constitutional violation does not take place "every time an inmate gets attacked by another inmate." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Jails and prisons "are dangerous places often full of people who have demonstrated aggression." *Id.* "It is not, however, every injury suffered by one prisoner at the hands of another that translates into

12

constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.

Mere "negligence" by correctional officials "is not enough" to give rise to a claim. *Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013); *Miranda v. County of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018). "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986); *Paul v. Davis*, 424 U.S. 693, 701 (1976) (rejecting a reading of the Due Process Clause that would make the "Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States").

In the past, the Seventh Circuit applied the same standard to conditions-of-confinement claims under the Eighth Amendment and the Fourteenth Amendment. *See Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019) ("For many years, we analyzed pre-conviction Fourteenth Amendment and post-conviction Eighth Amendment conditions-of-confinement claims under the same standard: that of the Eighth Amendment, which has both a subjective and an objective component."). Traditionally, "[t]o state a failure to protect claim, a plaintiff-inmate must allege that (1) 'he is incarcerated under conditions posing a substantial risk of serious harm,' and (2) defendant-officials acted with 'deliberate indifference' to that risk." *See Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834) (addressing a claim by a pretrial detainee under the Fourteenth Amendment); *see also Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006); *Payne ex rel. Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998) ("A detainee establishes a § 1983 claim by demonstrating that the defendants were aware of a substantial risk

of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger.").

But a pretrial detainee and a convicted prisoner stand in different shoes. Unlike a prisoner, a pretrial detainee hasn't been convicted of anything, and thus cannot be "punish[ed]." *See* U.S. Const. amend. VIII; *see also Kingsley*, 576 U.S. at 400 ("And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'") (citation omitted). "[T]he Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees." *Miranda*, 900 F.3d at 352. Different Amendments apply, and different standards apply, too.

In *Kingsley*, the Supreme Court addressed an excessive force claim by a pretrial detainee against jail officials. Off the bat, the Supreme Court distinguished between two separate state-of-mind considerations. *See Kingsley*, 576 U.S. at 395. A defendant's "state of mind with respect to his physical acts," and "state of mind with respect to whether his use of force was 'excessive.'" *Id.*

The first state-of-mind requirement remained firmly in place. A "defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" to give rise to a constitutional violation. *Id.* at 396; *see also id.* ("That is because, as we have stated, 'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.'") (emphasis in original) (citation omitted). *Kingsley* involved the other aspect of a defendant's state of mind, meaning the awareness of the excessiveness of the force (that is, the "defendant's state of mind with respect to the proper *interpretation* of the force"). *Id.* (emphasis in original).

The Supreme Court held that the due process standard for a pretrial detainee is "objective not subjective." *Id.* at 395. So the defendant's "state of mind is not a matter that a plaintiff is

14

required to prove" when it comes to the excessiveness of the force. *Id.* That is, a pretrial detainee does not have to prove that a prison guard was subjectively aware that the amount of force was unreasonable. A detainee "can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 398.

The Seventh Circuit has extended *Kingsley*'s objective unreasonableness standard to all conditions of confinement claims for pretrial detainees. *See Hardeman*, 933 F.3d at 823; *Miranda*, 900 F.3d at 350. In a concurring opinion in *Hardeman*, Judge Sykes summarized the elements of a conditions-of-confinement claim by pretrial detainees under the Fourteenth Amendment. Specifically:

> So to prevail on a claim alleging unconstitutional conditions of pretrial confinement, the plaintiff must prove three elements: (1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable – that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose."

*Id.* at 827 (Sykes, J., concurring) (ellipsis in original) (quoting *Kingsley*, 576 U.S. at 398).

That recitation closely parallels the earlier summary by the Seventh Circuit in *McCann v. Ogle County*, 909 F.3d 881 (7th Cir. 2018). The Court of Appeals noted that the "controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *Id.* at 886. The "first step . . . focuses on the intentionality of the individual defendant's conduct" when considering the consequences of his actions. *Id.* The "second step" asks "whether the challenged conduct was objectively reasonable." *Id.* Those two steps – plus the need for an objectively serious condition – mean that there are three requirements for a conditions-of-confinement claim by a pretrial detainee.

15

The Seventh Circuit does not appear to have addressed (to this Court's knowledge) a failure-to-protect claim by a pretrial detainee after *Kingsley* and *Miranda*. But several courts in this district have addressed post-*Kingsley* failure-to-protect claims under the Fourteenth Amendment. Along the way, district courts have noted that the Seventh Circuit in *Miranda* favorably cited a failure-to-protect case from the Ninth Circuit (albeit without getting into the weeds of that decision). *See Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Taking cues from that citation, a number of district courts have applied a four-part test applied by the Ninth Circuit in *Castro*. *See, e.g.*, *Thompson v. Modreno*, 2020 WL 4819266, at *4 (N.D. Ill. 2020); *Wilson v. Cook County*, 2020 WL 5642945, at *2 (N.D. Ill. 2020); *Ogunleye v. Bedolla*, 2020 WL 5702164, at *3–4 (N.D. Ill. 2020); *Williams v. Moffett*, 2021 WL 825670, at *8 (N.D. Ill. 2021). According to the Ninth Circuit, a pretrial detainee must satisfy the following four elements to prove a failure-to-protect claim:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071.

Maybe there is no daylight between the Seventh Circuit's standard for a conditions-of-confinement claim (as stated in *Hardeman* and *McCann*) and the Ninth Circuit's more specific summary of a failure-to-protect claim in *Castro*. But if there is any difference, this Court has a duty to apply the Seventh Circuit's standard.

In sum, Young must come forward with evidence that (1) he faced objectively serious conditions, meaning a substantial risk of serious harm; (2) the defendants acted purposefully,

knowingly, or recklessly with respect to the consequences of their actions; and (3) the defendants' actions were objectively unreasonable. *See Hardeman*, 933 F.3d at 827 (Sykes, J., concurring); *see also id.* ("[N]othing in *Kingsley* removed the threshold requirement in every conditions-of-confinement claim: 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.' That's because only 'objectively [and] sufficiently serious' deprivations are actionable as a violation of the Constitution.") (quoting *Farmer*, 511 U.S. at 834); *McCann*, 909 F.3d at 886. "In other words, a plaintiff must show that [] a defendant acted intentionally or recklessly as he knew, or should have known, that the condition posed an excessive risk to health or safety and failed to act with reasonable care to mitigate the risk." *Epps v. Patriquin*, 2020 WL 4505875, at *3 (N.D. Ill. 2020) (Dow, J.) (internal quotation marks omitted).

### B. The Evidence

Defendants argue that Young cannot succeed on his failure-to-protect claim because they were not aware of a specific risk of harm to Young from other inmates, or from Gama specifically.

Young focuses exclusively on Officer Oomens. In response to the motion, Young mentions the conduct of Officer Oomens, but does not discuss the conduct of any other officer. *See, e.g.,* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 5 ("A. Genuine Issues of Material Fact Exist As to Defendant Oomens's Conduct."); *id.* at 7 ("a. A Reasonable Jury May Conclude That Defendant Oomens Had Actual Knowledge Of The Risk."); *id.* at 9 ("b. A Reasonable Jury May Conclude That Defendant Oomens Was Deliberately Indifferent To The Risk."). By all appearances, Young has seemingly abandoned the failure-to-protect claims against everyone else.

17

Once again, it is important to differentiate the Fourteenth Amendment (which applies here) from the Eighth Amendment (which does not). In the Eighth Amendment context, failure-to-protect claims require a subjective awareness of the threat to the inmate. *See Sinn v. Lemmon*, 911 F.3d 412, 422 (7th Cir. 2018) ("Failure-to-protect claims are predicated on a prison official's subjective knowledge . . . ."); *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) ("[T]he prison official must have actual, not merely constructive, knowledge of the risk to be liable."); *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (noting that the "subjective prong of the deliberate indifference claim . . . requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable"); *Farmer*, 511 U.S. at 837 ("We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . ."). A prisoner "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (per curiam) (citation omitted). That awareness of a risk is part of deliberate indifference (as the name suggests).

There is a question whether a pretrial detainee with a Fourteenth Amendment claim must prove knowledge or notice of a substantial risk post-*Kingsley*. Even in the Fourteenth Amendment context, there appears to be an implicit requirement that the jail official knew, or had good reason to know, that the inmate faced a substantial risk of serious harm.

After *Kingsley* and *Miranda*, district courts have rejected claims by pretrial detainees when the correctional officers did not know or have reason to know of the threat. *See, e.g.*, *Thompson*, 2020 WL 4819266, at *4 (granting summary judgment to the correctional officer because the "undisputed facts in this case indicate that Defendant Modreno was not *on notice*

18

that Plaintiff was in fear for his safety," and "Plaintiff *never informed* Defendant Modreno"

about a prior incident) (emphasis added); *id.* ("To implicate the Constitution, a correctional

official must have enough information to suggest an objectively serious risk to the complaining

detainee's safety from another inmate."); *Wilson*, 2020 WL 5642945, at *3 (dismissing a

complaint because plaintiff "has not alleged that Leakakos *knew* of these prior incidents" of

violence, and has not alleged that the official "*knew* of any potential threats") (emphasis added);

*Ogunleye*, 2020 WL 5702164, at *4 (granting summary judgment because "no Defendant had

prior *knowledge* of the first incident," and Defendants were not "*aware* that Plaintiff was in fear

for his safety") (emphasis added); *Williams*, 2021 WL 825670, at *10 (granting summary

judgment because the facts "would not have put a reasonable officer *on notice* of a risk of serious

harm to Plaintiff") (emphasis added); *see also Johnson v. Taylor*, 2020 WL 5891401, at *2 (N.D.

Ill. 2020) (denying a motion to dismiss failure-to-protect claims because the complaint alleged

that the officers knew of the specific threat); *Colby v. Sokup*, 2020 WL 5211069, at *3 (E.D.

Wis. 2020) ("She does not allege that the defendant police officers knew that she was at risk of

being assaulted . . . .").

It is not immediately clear which element of a failure-to-protect claim gives rise to the

need for the correctional officer to know, or have reason to know, of the risk.  Courts are not

always explicit about which hook they're hanging their hat on.  That is, courts are not always

explicit about which element gives rise to a knowledge/notice requirement after *Kingsley*.

One possibility is that a defendant's awareness is relevant to the threshold requirement of

a substantial risk.  *See Brown*, 398 F.3d at 911 ("When our cases speak of a 'substantial risk' that

makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment,

they also have in mind risks attributable to detainees with *known* 'propensities' of violence

19

toward a particular individual or class of individuals; to 'highly probable' attacks; and to particular detainees who pose a 'heightened risk of assault to the plaintiff.'") (emphasis added); *see also id.* ("Having alleged such exposure to a heightened risk of assault, posed by a specific individual with allegedly *known* violent propensities, Brown has alleged a sufficiently substantial risk.") (emphasis added).

A second possibility is that knowledge of a risk has a bearing on whether an official acted purposefully, knowingly, or recklessly. The question is whether the defendant acted purposefully, knowingly, or recklessly "with respect to the consequences of his actions." *See Hardeman*, 933 F.3d at 826–27 (Sykes, J., concurring); *see also Miranda*, 900 F.3d at 353–54 (referring to a "purposeful, knowing, or reckless disregard of the consequences"); *Kingsley*, 576 U.S. at 395 (referring to a defendant's "state of mind with respect to the bringing about of certain physical consequences in the world"); *McCann*, 909 F.3d at 886–87 (considering whether a defendant "foresaw or ignored the potential consequences of her actions" when deciding whether a defendant acted purposefully, knowingly, or recklessly); *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020) ("[A plaintiff] must show that the defendant acted purposefully, knowingly, or recklessly when considering the consequences of his response to the medical condition at issue in the case."); *Pittman ex rel. Hamilton v. County of Madison*, 970 F.3d 823, 828 (7th Cir. 2020) (Barrett, J.) ("[I]f the defendants 'were aware' that their actions would be harmful, then they acted 'purposefully' or 'knowingly'; if they were not necessarily 'aware' but nevertheless 'strongly suspected' that their actions would lead to harmful results, then they acted 'recklessly.'"). Knowledge of the present has a bearing on an awareness of future consequences.

Another possibility is the reasonableness of the defendant's actions. Courts must consider "reasonableness" based on "the perspective and with the knowledge of the defendant

officer." *See Kingsley*, 576 U.S. at 399; *see also id.* at 397 ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer *knew* at the time, not with the 20/20 vision of hindsight.") (emphasis added). So the defendant's knowledge may bear on whether he acted reasonably.

Putting aside which doctrinal box applies, it does appear that a correctional officer is not liable on a failure-to-protect claim unless the officer knew or had good reason to know about the substantial risk of serious harm. Without knowledge or notice, there is no claim.[4]

Young acknowledges that a detainee in a failure-to-protect claim "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 6 (Dckt. No. 124) (citation omitted).[5] "The plaintiff . . . must prove that prison officials were aware of a specific, impending, and substantial threat to his safety, often by showing that the plaintiff complained to

---

[4] Applying the objective unreasonableness standard post-*Kingsley* seems a little more tricky in a failure-to-protect case than in other areas, perhaps because it involves a failure to act. *See Castro*, 833 F.3d at 1069 ("An excessive force claim, like the one at issue in *Kingsley*, differs in some ways from a failure-to-protect claim, like the one at issue here. An excessive force claim requires an affirmative act; a failure-to-protect claim does not require an affirmative act."). A plaintiff must prove objective unreasonableness, but negligence (standing alone) is not enough to bring a claim. A plaintiff also must prove that the defendant acted purposefully, knowingly, or recklessly. But a plaintiff does not have to prove deliberate indifference, either. So, a plaintiff must prove that the defendant failed to protect the plaintiff, and did so purposefully, knowingly, or recklessly, but does not have to prove that the defendant was deliberately indifferent. The line between a failure to act that is purposeful, knowing, or reckless (on the one hand) and deliberate indifference (on the other) is not the brightest, but this Court need not figure out where, exactly, that boundary lies.

[5] Young cited the wrong standard in his brief. Young was a pretrial detainee, not a convicted prisoner. So the objective unreasonableness standard under the Fourteenth Amendment applies, not the deliberate indifference standard under the Eighth Amendment. But in his brief, Young invoked the deliberate indifference standard for convicted prisoners under the Eighth Amendment, not the objective unreasonableness standard for detainees under the Fourteenth Amendment. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 5–12 (Dckt. No. 124). And he spent little time discussing the requirement that there must be a substantial risk of harm. *Id.* at 5–6. Still, the Court considers Young's arguments about Officer Oomens's deliberate indifference (even though that's the wrong standard, because Young was not a convicted prisoner) in its analysis of his awareness of the risk of harm to Young.

prison officials about a *specific* threat to his safety." *See Miller v. Turner*, 26 F. App'x 560, 563 (7th Cir. 2001) (emphasis in original) (citing *Pope*, 86 F.3d at 92).

Young has presented no evidence that he feared an attack by Gama (or anyone else) and that he told any prison officials that he was at risk of attack. Instead, Young makes one argument that is specific to him, and one argument about incarceration in general.

First, Young suggests that maybe Officer Oomens was subjectively aware of a specific risk of violence between him and Gama. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 7 (Dckt. No. 124) ("The contemporaneous interviews of both Plaintiff and Gama contradict the claim that Defendant Oomens could not have been subjectively aware of risk [sic] to Mr. Young."). Young floats that possibility, but does not support it with any evidence. There is no evidence in the record that Officer Oomens – or any other officer – was, in fact, aware that Gama posed a risk to Young.

Young bases Officer Oomens's potential awareness on the fact that he and Gama agreed "that there were at least tensions between the two from prior interactions while in jail." *Id.*; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 35 (Dckt. No. 125). Young points to the summary of the incident prepared by the Sheriff's Office, which reported that "Inmate Young stated to Sgt. Plante that the incident is from a prior time when inmate Young observed inmate Gama tampering with a metal vent in holding cell located in the CCB building Room 202 and stated that he was going to tell if he did not stop." *See* 11/7/16 Incident Report, at 1 (Dckt. No. 116-7).

There are several problems with that line of argument. For starters, Young does not present evidence that any of the officers were aware of any tension between Young and Gama.

Maybe there was tension. But if the officers didn't know about it, the existence of tension isn't enough to get a claim off the ground.

And even then, things weren't so tense that Young anticipated an attack. He doesn't offer evidence that he feared an imminent fight. Instead, he does the opposite. He characterizes the attack as unexpected. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 125) (agreeing with the Defendants' statement that "Plaintiff was unexpectedly attacked from behind"); *see also* 11/7/16 Inmate Grievance (Dckt. No. 116-9) (explaining that "an inmate came from behind me [and] attacked me for no reason").

"Actual knowledge cannot be imputed to a prison official if the plaintiff himself was unaware of a specific threat." *See Conwell v. Johnsen*, 2016 WL 6661169, at *8 (N.D. Ill. 2016) (citing *Guzman v. Sheahan*, 495 F.3d 852, 857–58 (7th Cir. 2007)); *see also Patterson v. Kelley*, 902 F.3d 845, 851–52 (8th Cir. 2018) ("[Plaintiff's] own inability to anticipate the surprise attack and his decision not to report his altercation with [his attacker] the previous afternoon defeat liability."). If Young didn't anticipate the attack, the officers can't be liable for failing to anticipate the attack.

Maybe violence was possible, but that's not enough. "[A] 'mere possibility of violence' or the occurrence of a random act of violence is not sufficient to impose liability on prison officials." *See Miller*, 26 F. App'x at 563 (citations omitted); *Washington v. LaPorte Cty. Sheriff's Dep't*, 306 F.3d 515, 519 (7th Cir. 2002) ("[A]n unfortunate random act of violence in a prison . . . does not impose liability on prison officials."); *see also Guzman*, 495 F.3d 852, 857–58 (holding that plaintiff failed to demonstrate that officers were on notice of a substantial risk of harm where the record did not demonstrate that any individual officials "were *actually* aware of [the attacker's] proclivity for violence" and plaintiff "produce[d] no evidence that even would

23

support an inference that such an awareness existed") (emphasis in original); *Boyce v. Obaisi*, 2015 WL 5462137, at *13 (N.D. Ill. 2015) (granting summary judgment to prison officials where "the evidence does not suggest any significant sign or risk of danger, let alone a danger so pervasive as to render Defendants liable for these random attacks."). Young does not present any evidence that Officer Oomens, or any other officer, was aware of any risk of violence before the attack occurred.

Second, Young relies on a general risk to medium security detainees (like Young) from maximum security detainees (like Gama). Young argues that Officer Oomens was subjectively aware of "risks specific to detainees . . . during the court movement process."[6] *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 9 (Dckt. No. 124). "He was well aware of the standard practice of commingling maximum security detainees – which are widely known to pose particular risk . . . – with other detainees for court movement, and of the fact that that practice historically led to altercations on an average of once per week." *Id.* (citations omitted); *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 132) (noting that on the day in question, Gama's security classification was maximum while Young's was medium).

Young relies on testimony from Officer Oomens about changes to the jail's policy about court movement. *See* Pl.'s Statement of Additional Facts, at ¶¶ 5–6 (Dckt. No. 125). At deposition, Officer Oomens testified that at the time of the attack, detainees did not wear handcuffs or restraints when in the bullpens, but that the policy later changed. *See* Oomens Dep.,

---

[6] Young also contends that the Defendants have admitted that "maximum security detainees such as Gama present a serious risk to other, lower-security detainees such as Plaintiff." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 5 (Dckt. No. 124). But to support this fact, Young cites to a non-party's deposition transcript and a summary judgment filing from a 2004 case. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 16 (Dckt. No. 132); *see also* Pl.'s Ex. S (Dckt. No. 125-20) (from Case No. 04-cv-1051); Pl.'s Ex. T (Dckt. No. 125-21) (same). These documents do not constitute admissions by the individual officer defendants in this case, who were not defendants in that case.

at 21:9-17 (Dckt. No. 125-6). He testified that he believes this change was made "because of the physical altercations" but "do[es] not know the exact reason." *Id.* at 21:18-21; *see also id.* at 26:23 – 27:4 ("Like I stated before, the basis for them doing that change is because of the altercations that there had been in all the courtrooms between holding and receiving, all the way up to the physical altercations in the bullpens of the courtroom.").

This testimony demonstrates Officer Oomens's awareness that some altercations occurred. But it doesn't support Young's argument that he was aware of a more specific risk of violence. And it doesn't show that he believed attacks by maximum security detainees against medium security detainees were especially likely.

"[A] generalized risk of violence is not enough, for prisons are inherently dangerous places." *Wilson v. Ryker*, 451 F. App'x 588, 589 (7th Cir. 2011); *see also Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) ("It is certainly true that a deliberate indifference claim cannot be predicated merely on knowledge of general risks of violence in prison."). A generalized risk will not typically be "substantial" because it is not "almost certain to materialize if nothing is done." *Brown*, 398 F.3d at 911. "However, a risk is not rendered general merely because it is not personal to plaintiff." *Id.* at 913. Still, the risk must be specific in some way, even if it is not personal to the plaintiff. The Seventh Circuit in *Brown* held that the allegations of "a risk posed by a specific assailant, with known propensities of violence toward a specific class of persons (Caucasian residents) who was left in his presence unsupervised," did not "detail a mere general risk of violence in the facility, but rather a particular – albeit non-personal – threat to Caucasian residents." *Id.*

A plaintiff must assert a specific problem, and a specific threat, that a prison official disregarded, thereby creating unconstitutional conditions. *See, e.g.*, *Ogunleye*, 2020 WL

5702164, at *4 (granting summary judgment for officers where "the record establishes that none of [those defendants] were aware that Plaintiff was in fear for his safety" and denying summary judgment against officer who "was on notice that Plaintiff was concerned about his physical safety"); *Thompson*, 2020 WL 4819266, at *4 ("The undisputed facts in this case indicate that Defendant Modreno was not on notice that Plaintiff was in fear for his safety . . . ."); *see also id.* ("To implicate the Constitution, a correctional official must have enough information to suggest an objectively serious risk to the complaining detainee's safety from another inmate.") (citation omitted).

Young doesn't point to anything that put the officers on notice that there was a substantial risk of an attack. (Again, Young focuses on Officer Oomens in his brief, but the point is the same for all of the officers.) Young also hasn't pointed to anything specific about Gama that would have put the officers on notice. He doesn't provide evidence about any known propensities, or evidence that suggests that this particular attack was "highly probable." *See Brown*, 398 F.3d at 911; *see also Shaffer v. Randall*, 2017 WL 1739913, at *3 (N.D. Ill. 2017) ("[A] plaintiff cannot show that a defendant officer was on notice of a substantial risk of harm by pointing to a surprise attack, with no advance warning of either the plaintiff's vulnerability or the assailant's predatory nature.") (citing *Guzman*, 495 F.3d at 857–58).

The fact that Gama was a maximum security detainee is not enough. Otherwise, prison officials could be held liable for failing to prevent every attack from a maximum security detainee. *See, e.g.*, *Leslie v. Wisconsin Dep't of Corr.*, 2000 WL 689185, at *2 (7th Cir. 2000) ("Prison officials' general awareness that a facility housing maximum security inmates is more dangerous than one housing only medium security inmates does not meet the deliberate indifference standard."); *Curry v. Butler*, 2016 WL 11467576, at *3 (S.D. Ill. 2016) ("[T]here is

26

a certain degree of risk inherent in a maximum security prison environment and . . . prisoners

have a right to avoid conditions of confinement that present 'a substantial risk of serious harm.'

But prisoners are not entitled to a completely risk free environment.").

 The Seventh Circuit has held that prison officials must "refrain from placing [a prisoner]

in harm's way gratuitously." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). "The

qualification 'gratuitously' is important, because prisons are dangerous places. Inmates get there

by violent acts, and many prisoners have a propensity to commit more. Guards cannot turn away

persons committed by the courts; nor do individual guards have any control over crowding and

other systemic circumstances. All that can be expected is that guards act responsibly under the

circumstances that confront them." *Id.*

 The record at hand includes no evidence that any guard gratuitously put Young in harm's

way. The fact that detainees of different security classifications were held together in the bullpen

simply isn't enough to put Officer Oomens on notice about an imminent attack, and thus cannot

give rise to liability.

 It's true that, as shown in the video, Officer Oomens did not appear to require

identification from Gama before he exited the bullpen. *See* Division 5 Bullpen Video, at 8:50:48

to 8:51:00 (Dckt. No. 116-6); Security Camera Video, at 0:40-55 (Dckt. No. 125-19); *see also*

Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 11–12 (Dckt. No. 132). At the time, the

Jail's policy required an officer to verify a detainee's identity by "reviewing their identification

cards and court passes before allowing them to exit the holding cell." *See* Defs.' Resp. to Pl.'s

Statement of Additional Facts, at ¶ 14. But for whatever reason, Officer Oomens allowed Gama

out of the bullpen without collecting any documentation. Young argues that this violation of the

Jail's policy is enough to avoid summary judgment. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10–11 (Dckt. No. 124).

Not at all. At most, that evidence goes to whether the officers followed the policy. It does not support the notion that the officers were aware of any threat against Young. A failure to follow a policy is not the same thing as an awareness of a potential threat.

And even then, a failure to follow a policy is not enough to give rise to a claim. Section 1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *see also Wilson*, 2020 WL 5642945, at *2–3 (dismissing failure to protect claim where defendant "may not have followed Jail rules in leaving the day room unattended" but had no notice "of the potential danger in leaving [the plaintiff and his attacker] unsupervised in the day room"). It is not enough to argue that Officer Oomens should not have let Gama out of the bullpen. That's an argument about negligence, and negligence is not a constitutional violation. *See Kingsley*, 576 U.S. at 396.

The officers also assert a qualified immunity defense. But this Court does not need to reach that issue because there was no underlying violation of Young's rights.

Defendants' motion for summary judgment on Count II is granted.

## III.    *Monell* **Claim**

Young's third claim is a *Monell* claim brought against Sheriff Dart as the head of the Cook County Sheriff's Office. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" must have played a part in the violation of federal law.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "The liability of the Sheriff's Department and

of the County is derivative of [Dart's] official-capacity liability, and the official-capacity liability is subject to [the] holding in *Monell* . . . ." *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)).

Sheriff Dart argues that he is entitled to summary judgment because Young has not presented sufficient evidence of an official policy, custom, or practice to impose liability on the municipal entity. *See* Defs.' Mem. in Supp. of Mtn. for Summ. J., at 12–14 (Dckt. No. 115).

But the Court need not reach that argument. To prevail on a *Monell* claim, a plaintiff must first establish an underlying constitutional violation. *See Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010) (holding that when "there is no underlying constitutional violation, [a] City cannot be liable under *Monell*"). "A *Monell* plaintiff must establish that he suffered a deprivation of a federal right *before* municipal fault, deliberate indifference, and causation come into play." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (emphasis in original).

Here, Young was attacked out of the blue. Courts do not impose liability on prison officials for failure to protect when random attacks occur without any advance notice. A failure to protect a detainee from a random attack is not a constitutional violation. *See Miller v. Turner*, 26 F. App'x 560, 563 (7th Cir. 2001) ("[A] 'mere possibility of violence' or the occurrence of a random act of violence is not sufficient to impose liability on prison officials.") (citation omitted); *Washington v. LaPorte Cty. Sheriff's Dep't*, 306 F.3d 515, 519 (7th Cir. 2002) ("[A]n unfortunate random act of violence in a prison . . . does not impose liability on prison officials."); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials

29

responsible for the victim's safety."); *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (observing that jails and prisons "are dangerous places often full of people who have demonstrated aggression").

The lack of an underlying constitutional violation means that there is no claim. But even if the Court considered whether any policy, custom, or practice caused Young's injury, the outcome would remain the same. A policy, custom, or practice must be the "moving force" behind the violation. *See Estate of Sims*, 506 F.3d at 514 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

Young asserts that his "official-capacity claim is not, as Defendants seem to believe, based on Defendant Dart ratifying the violation of pre-existing policies; rather, it is based on the deficiency of the pre-existing policies themselves." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 12 (Dckt. No. 124). His claim, Young continues, is that "on the day of the attack and going back at least to 2013, the established practice at Cook County Jail for court movement permitted unrestrained maximum security detainees to be commingled with minimum or medium security detainees." *Id.* at 12. Because maximum security detainees are more dangerous, so the argument goes, Young's injuries "would not have occurred were it not for those policies." *Id.* at 12–13. Young argues that this practice has since changed, and that the change "resulted in a significant reduction in the number of altercations during court movement." *Id.* at 13.

It is true that the Sheriff's Office later changed the policy, but that's not enough. The failure to take a specific preventative measure, without more, is not enough to show that the policy was the moving force behind the injury. *See Washington*, 306 F.3d at 519 (holding that "a decision to implement a program which, in general terms, could increase the probability of violence" is not enough to impose liability on prison officials for random acts of violence);

30

*Grieveson v. Anderson*, 538 F.3d 763, 772 (7th Cir. 2008) ("If Grieveson showed a prison policy or custom that effectively allowed prisoners to beat one another, he might have had a successful claim against the County."); *see also id.* ("Grieveson is trying to shoehorn a claim for deliberate indifference of particular jail officials into an official-capacity claim by pointing to a prison policy that has no causal connection to the harms Grieveson suffered at the hands of other inmates."). "It is only 'when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.'" *Id.* at 773 (quoting *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)).

At bottom, Young is arguing that the Sheriff's Office could have done more to prevent the attack from happening in the first place. The Sheriff's Office, in his view, should have had different and better policies in place. But that's an argument about negligence, that is, that the Sheriff's Office acted unreasonably by failing to take a safety precaution. And negligence is not enough to give rise to a claim. *See Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018) (emphasizing that the objective unreasonableness standard does not allow "mere negligence to suffice for liability"); *Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013).

Young points to a couple of district court cases holding that a given policy or practice may give rise to liability for failure to protect. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 13–14 (Dckt. No. 124) (citing *Shultz v. Dart*, 2016 WL 212930, at *7–9 (N.D. Ill. 2016); *Potts v. Manos*, 2017 WL 4340157, at *5 (N.D. Ill. 2017)). But they do not help him here. *Potts* involved a pattern of failing to protect a detainee from the use of excessive force by jail officials, not other detainees. *Potts*, 2017 WL 4340157, at *1, *3. And *Shultz* dealt with a policy or custom that placed officers in positions where they would be unable to respond to a detainee or

31

inmate's calls for help. *Shultz*, 2016 WL 212930, at *7–8 (denying summary judgment on *Monell* claim asserting that a policy created a "critical security gap" and a practice placed "inmates out of [the tier officers'] sight and hearing").

That's not the situation here. At least four officers were in the vicinity and responded immediately to the attack on Young. So on the day in question, no policy prevented the officers from adequately responding to an unpredictable, surprise attack. And the general policy of allowing maximum and medium security detainees to be transferred together is too far removed to be the "moving force" behind the attack. The Jail's policies or practices did not cause or enable a random, surprise attack. Gama attacked Young out of nowhere, in full view, and within arm's reach, of several officers.

Whether the Jail's court movement policy was the best possible policy to prevent violence between detainees is not the question. Indeed, Defendants acknowledge that after changing some of the procedures for court movement, fewer attacks occurred. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 3–4, 6 (Dckt. No. 132). But courts are not tasked with determining whether one policy is better than another. *See Money v. Pritzker*, 453 F. Supp. 3d 1103, 1129 (N.D. Ill. 2020) (Dow, J.) ("The Supreme Court repeatedly has cautioned that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons."); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 399–400 (2015); *Mays v. Dart*, 974 F.3d 810, 820–21 (7th Cir. 2020). The question is only whether a Sheriff's Office policy caused the attack. And here, no reasonable jury could find that it did.

The Court grants Defendants' motion for summary judgment on Count III.

## Conclusion

For these reasons, Defendants' motion for summary judgment is granted on all counts (Counts I, II, and III).

Date:  August 17, 2021

_____

Steven C. Seeger
United States District Judge